**GATHERCREST LTD., a foreign business entity, and State Bank of India, a foreign business entity, Plaintiffs,**

v.

**FIRST AMERICAN BANK AND TRUST, a Florida banking corporation as successor in interest to Merritt Square Bank, Defendant.**

No. 84–350–CIV–ORL–18.

United States District Court, M.D. Florida, Orlando Division.

July 8, 1985.

Thomas Fotopulos, Tampa, Fla., for plaintiffs.

Jack A. Kirschenbaum, Cocoa Beach, Fla., for defendant.

## OPINION AND ORDER

GEORGE KENDALL SHARP, District Judge.

This case came before the Court for a non-jury trial on May 17, 1985. Pursuant to Federal Rule of Civil Procedure 52, the Court enters the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

In this action, plaintiffs seek damages in excess of $10,000, interest, attorneys' fees and costs from defendant on theories of breach of contract, negligence and breach of fiduciary duty in connection with defendant's handling of two international documentary transfer and bill of exchange collections. Plaintiffs Gathercrest, Ltd. (Gathercrest) and State Bank of India (SBI) are business entities organized under the laws of foreign countries with their principal places of business in London, England. Defendant First American Bank and Trust (FABT) is sued as the successor in interest

to Merritt Square Bank (MSB), and is a Florida banking corporation with its principal place of business in Brevard County, Florida.

According to the testimony of Niranjan Shah, a Gathercrest officer, that company's business activities include providing financing for manufacturing enterprises. In 1979 Ted Hearn, the managing director of Pan Aqua Limited (Pan Aqua), sought financing for a proposed deal with a United States company. As a result of an agreement between Shah and Hearn on behalf of their respective companies, Gathercrest advanced funds to Pan Aqua to enable it to manufacture machines for which Hearn had received orders from Product Movement Systems (PMS), a Florida company. Hearn represented to Shah that PMS had a line of credit and banking arrangements with MSB. Neither SBI nor Gathercrest had any prior banking relationship with MSB.

The exhibits and trial testimony show that Pan Aqua initiated the first transaction by drawing a bill of exchange for £20,253 due March 18, 1980 to the order of Gathercrest and provided Gathercrest with the documents of title for the goods being purchased by PMS, which was the drawee on the bill. Gathercrest accepted the bill of exchange and documents of title as repayment of the money it advanced Pan Aqua. On or before December 19, 1979, Gathercrest endorsed the bill of exchange to SBI and submitted it, along with the original documents of title, to plaintiff SBI, which provided banking collection services for customers such as Gathercrest for a nominal charge. On January 11, 1980, SBI dispatched the bill of exchange with its accompanying documents of title to defendant MSB. SBI's documentary transfer and collections instructions to MSB accompanying the first bill of exchange and documents of title specified that the documents were to be released against acceptance, that MSB was to advise of acceptance and due date by airmail or cable, to advise of non-acceptance by cable, giving the rea-

sons therefore, to remit proceeds by cable, and the "other instructions" section of the transfer document stated "Subject to Uniform Rules of Collection (1978 Revision) International Chamber of Commerce Publication No. 322."

Shah testified that the bills of lading were included in the documents transmitted to SBI, and Peter Guilian, an SBI officer, testified that although he had no independent knowledge, all the documents listed in the instruction letter would necessarily have been transmitted to MSB both initially on January 11 and subsequently on January 31 as to the first bill, and on June 10 as to the second bill. Guilian pointed out that the collection instruction letters listed the bills of lading, specified that the documents should be released against acceptance, and would not have been sent if there was not a bill of lading attached. On the other hand, Donna Garrison, a representative of MSB testified that it was MSB's usual and customary practice where it was not aware that the drawee was its customer to copy all documents received and return all the documents unpaid. Garrison indicated that the documents included in SBI's initial transmission of the first bill of exchange were copied, but that MSB does not have any copies of bills of lading or documents of title in its files.[1] Based upon this testimony, MSB contends that both bills of exchange were not accompanied by documents of title. Upon review of the entirety of the trial testimony and exhibits the Court finds that the documents of title accompanied both bills of exchange. In the circumstances in this case, the Court can ascertain no other logical, reasonable explanation of how the American distributor obtained the documents of title.

On January 22, 1980 MSB returned the documents to SBI stating "this is not in our records, this is not our collection." After receiving the documents returned by Defendant MSB, SBI consulted with Gathercrest. Pursuant to Gathercrest's instructions, SBI returned the documents along with the original documentary and collec-

---

1. The Court notes that Garrison testified only in reference to the first bill of exchange.

tion instructions to MSB under cover of a registered letter of January 31, 1980, which stated:

> Documents covering our above collection were returned by you unaccepted. We now understand from the drawees that there was some misunderstanding about the documents and they are now anxiously awaiting them as the goods have reached there and are incurring heavy demurrages. In the circumstances we are returning the documents with a request to re-present them to the drawees marking attention of Mr. William Schwab and/or Dr. Walter Cerrato. Documents should be delivered to them only against their acceptance of the Bill of Exchange.

Soon after SBI returned the bill of exchange and documents of title to MSB on January 31, 1980, Hearn on behalf of Pan Aqua amended the first bill of exchange, substituting Kwik Blast America (Kwik Blast) as the drawee and extending the due date to April 18, 1980. The bill of exchange was accepted for payment on that due date by William Schwab on behalf of Kwik Blast. The documents of title accompanying the first bill of exchange were released upon acceptance, presumably to the substituted drawee, Kwik Blast, and the bill of exchange was released to Hearn.

The original documents of title which accompanied the first bill of exchange were presented to S.E.L. Maduro steamship agent Frank Subiaro on February 13, 1980. Prior to their amendment and release, these documents had been transmitted to MSB under cover of a registered letter. At trial, Thomas Berrell, a vice president of MSB, denied that he met with Hearn, Schwab and/or other persons in connection with the first bill of exchange and indicated that he simply does not know how this bill of exchange was amended or how it left the possession of MSB. However, the Court must infer from the documentary evidence that MSB either allowed the bill of exchange to be amended and released the bill of exchange and documents of title, or that MSB simply "lost" the bill of exchange and accompanying documents. Upon review of the documentary evidence and con-

sideration of the lack of credibility of Berrell as a witness, the Court finds that MSB allowed Hearn to amend the bill of exchange, released the amended bill of exchange to Hearn, and released the documents of title, presumably to Kwik Blast.

Under cover of a letter addressed to Shah dated February 10, 1980, Hearn returned the first bill of exchange to Gathercrest. In that letter, Hearn stated in part:

> I enclose the signed and accepted Bill of Exchange from our Distributor in Florida, and you will note I have extended the due date by a month, as due to a whole chain of unfortunate happenings the Bill of Exchange together with Documents only arrived three days ago and the goods cannot be collected out of customs until next Tuesday.

Although Gathercrest had not given Hearn or anyone else authority to amend the bill, Shah of Gathercrest immediately returned the bill to proper banking channels, under cover of Gathercrest's letter of February 21, 1980 to SBI. In this letter, Gathercrest failed to object to the amendment, and apparently never objected in any other manner to the amendment of the bill. The February 21st letter to SBI specified:

> We have to advise that the above Bill has been returned to us by the drawer for making certain changes to the Bill. These changes have now been made to the Bill as follows:
>
> i) The name of the drawee has been changed to "Kwik Blast America."
>
> ii) The due date of the Bill has been changed from 18th March 1980 to 18th April 1980.
>
> Please now forward the amended Bill to the collecting bank quoting your *same OBC number* and instruct them to opresent the Bill to the drawee for payment on the due date. On payment the proceeds of the Bill should be remitted by *Telex* for the credit of our account with you. All your charges should b[e] recovered from the drawees. All other instructions contained in our covering scheduled remain unchanged.

SBI in turn forwarded a copy of Gathercrest's letter and the amended and accepted bill of exchange to MSB under cover of SBI's letter of March 7, 1980, which indicated that Gathercrest's letter was self-explanatory. Receipt of amended bill and instructions was acknowledged by MSB on March 20, 1980.

The first bill of exchange, due for payment on April 18, 1980, was dishonored by substitute drawee Kwik Blast. However, MSB failed to notify the plaintiffs of that fact until July 21, 1980, more than three months after the dishonor, and then only in response to the third of plaintiffs' inquiries on June 12, 1980 by chaser memorandum and on July 17 and 18 by telexes. In response to the SBI telexes, MSB indicated that Kwik Blast was awaiting confirmation and reply letters from Hearn prior to negotiating the draft (bill of exchange) for collection. According to the testimony at trial, these chasers were sent at the request of Gathercrest. In "courtesy" collection transactions such as the two in this case, the customer (Gathercrest) rather than SBI kept track of the due dates. Shah testified that he inquired about the bill several times and that his customer, presumably Hearn of Pan Aqua, said that payment would be forthcoming shortly.

Meanwhile, Gathercrest received a second bill of exchange and documents of title from Pan Aqua in return for funds advanced to Pan Aqua. The second bill of exchange, which was drawn by Hearn on behalf of Pan Aqua, was payable to the order of Gathercrest in the amount of £29,851.00, specified MSB as the drawee, and was due on September 29, 1980. However, Gathercrest's June 9, 1980 instructions to SBI accompanying the second bill and documents of title listed "Kwick-Blast" as the drawee, and SBI's documentary transfer and collection instructions dated June 10, 1980 also specified "Kwick-Blast" as the drawee. Kwik Blast was misspelled in an identical manner in both transfer letters. SBI's representative Guilian testified that the bill itself was correct and that the SBI transmittal letter was in error because the bills are inspected before SBI accepts them

and are rejected if they contain an error. Shah testified that the designation of MSB on the bill as drawee was not in error and that Gathercrest was told that the bill could be drawn on MSB. Shah indicated that the designation in the transmittal letter of Kwik Blast as the drawee was simply a mistake. On the other hand, plaintiffs' expert testified on cross-examination that typically in international documentary transactions the buyer, here Kwik Blast, is the drawee, and that based upon the Gathercrest and SBI transmittal instructions the designation of MSB as drawee is error and Kwik Blast should have been the drawee. In the subsequent communications between SBI and MSB the drawee was described as MSB on some occasions and Kwik Blast on others.

The Court concludes, despite the contradictions in plaintiffs' case, that MSB was the drawee on the second bill of exchange. The bill of exchange unambiguously designates MSB as the drawee. The bill was drawn against MSB by Hearn on behalf of Pan Aqua, and the transmittal letters by Gathercrest and SBI should not vary its terms. Further, Gathercrest seems to have believed, whether or not it was true, that Pan Aqua's American distributor had financial arrangements with MSB which included a line of credit. Thus, Gathercrest's acceptance of a bill drawn against MSB is understandable in the circumstances of this case. From the exhibits, trial testimony and reasonable inferences, the Court concludes that the bill of exchange was drawn against MSB, and the subsequent transmittal letters were in error.

Gathercrest endorsed the second bill of exchange payable to SBI and forwarded the bill, documents of title and instructions on June 9, 1980. SBI in turn forwarded the documents to defendant MSB under cover of its documentary transfer and collection instructions dated June 10, 1980. The documents accompanying the second bill of exchange were to be released by MSB only upon acceptance of the obligation to pay the face amount of the second bill of exchange on September 29,

1980. MSB neither notified SBI that it had accepted or not accepted the second bill, nor returned the bill to SBI. However, MSB apparently released the accompanying documents of title to representatives of Kwik Blast, and Kwik Blast presented the documents of title to Harrington Steamship Lines for release of the second shipment of goods on July 2, 1980.

In a July 10, 1980 interoffice memo, defendant MSB acknowledged the existence of two outstanding "Letters of Credit to Pan Aqua" described as "biggies." The memo and accompanying letters seem to establish that Kwik Blast in fact had a significant banking relationship with MSB.

On August 12, 1980, Gathercrest wrote to SBI asking the bank to request that the collecting bank on the first bill of exchange have the bill paid and remit the proceeds by Telex/cable without delay. On August 14, 1980, SBI forwarded Gathercrest's letter to MSB and requested that MSB press for payment and remit the proceeds by cable. MSB failed to respond to this letter, and on September 15, 1980 SBI telexed MSB and requested that MSB protest the first bill for dishonor, attach the goods, and advise SBI of its position. In the same telex, SBI requested that MSB advise it of the actions MSB had taken on the second bill of exchange drawn on and accepted by MSB. The Florida bank again failed to respond despite the designation of urgent on the September 15 telex, and on September 18 SBI again telexed MSB requesting information about the two bills of exchange. Berrell, MSB's vice president, admitted at trial that MSB failed to protest the dishonor of the first bill and to attach the goods.

On September 23, 1980, Berrell of MSB turned over all Kwik Blast collection documents to attorney Harry Jones. The parties stipulated that at all pertinent times Dr. Walter Cerrato was a 9% shareholder and a director of MSB and that Harry Jones was his attorney. Jones testified at trial that he formed Kwik Blast at Dr. Cerrato's request, and that prior to formation of Kwik Blast as a corporate entity on February 13, 1980, Dr. Cerrato was doing business under that name.

At all times material to the collection efforts of MSB, Berrell knew that Dr. Cerrato was one of the principals of Kwik Blast, the substitute drawee under the first bill of exchange. Jones testified that in his opinion he was acting as MSB's attorney when he gave Berrell advice about how to respond to the SBI telexes. He also testified that at that time he did not see any conflict of interest in advising MSB about the bills of exchange despite his representation of Dr. Cerrato. On October 14, 1980 Jones filed a security interest on behalf of Dr. Cerrato against Kwik Blast goods. On September 29, 1980, Berrell, acting on the advice of Jones, advised SBI by letter and telex containing identical wording that MSB was:

> Unable to collect further from Kwik Blast America. Cannot comply with attachment request. Forwarding under separate cover all documents pertaining to your transactions with Kwik Blast through Merritt Square Bank.

Plaintiffs' expert witness, Randy Phillips, testified that under United States banking customs and the UCC reasonable notice of dishonor would occur one to two weeks after receipt of an item. Plaintiffs' expert further testified that the Uniform Rules of Collection (1978 Revision) International Chamber of Commerce doc. 322 (ICC 322) reflects the standards of international banking on drafts and that it is normal and customary to incorporate ICC 322 in the transmittal letters that accompany documentary drafts. In addition, Phillips testified that it would be the normal practice of a bank providing the services afforded by SBI in these transactions to note the due date in a "tickler file", and if payment was not made on or before the due date to cable to determine the status of the draft within two to three weeks or a month.

The second bill of exchange was never accepted by anyone, although the documents of title were released by MSB. Neither of these two bills of exchange was ever paid. Gathercrest eventually sued

Hearn, the principal of Pan Aqua and obtained a judgment against him. Recently, Gathercrest filed suit against Dr. Cerrato as a principal in Kwik Blast. However, Shah testified that Gathercrest has yet to collect anything from anyone in connection with these two international banking transactions. Shah also testified that had Gathercrest received notice of dishonor of the first bill within one to two weeks, it would have contracted its lending to Pan Aqua and would not have undertaken the second transaction. The Court notes that the first bill was over 50 days overdue at the time the second transaction was undertaken, and that Gathercrest did not inquire through banking channels about the status of the first bill until the second transaction had been undertaken. However, Gathercrest did inquire about the first bill through Pan Aqua, its customer. SBI's representative admitted that SBI had not suffered any damages in connection with MSB's handling of the two transactions.

In Counts I and III of their complaint, plaintiffs seek damages for MSB's breach of contract in failing to comply with SBI's instructions, the UCC, and the URC in its handling of the two transactions. Counts II and IV allege negligence in notification of non-acceptance and dishonor, and in failure to attach as requested. Plaintiffs also seek pre-judgment interest, attorney's fees and costs.

## CONCLUSIONS OF LAW

This Court has diversity jurisdiction over this matter pursuant to 28 U.S.C.A. § 1332(a)(2). Venue in this district and division is proper under 28 U.S.C.A. § 1391 and Local Rule 1.02, M.D.Fla. MSB's liability under the UCC for "action or non-action with respect to any item handled by it for the purposes of presentment, payment or collection is governed by law of the place where the bank is located." Fla.Stat. § 674.102(2). MSB is located in Brevard County, Florida; thus the Florida version of the pertinent UCC sections applies in this case.

### A. *Applicability of the URC*

Defendant admits that the UCC applies in this case, but contends that the provisions of the URC should not govern its conduct. The UCC specifies that parties may vary the provisions of Article 4 on Bank Deposits and Collections as follows:

> The effect of the provisions of this Article may be varied by agreement except that no agreement can disclaim a bank's responsibility for its own lack of good faith or failure to exercise ordinary care or can limit the measure of damages for such lack or failure; but the parties may by agreement determine the standards by which such responsibility is to be measured if such standards are not manifestly unreasonable.

Fla.Stat. § 674.103(1). The regular rules for determining whether there is an agreement between the parties must be applied under UCC § 4–103 [Fla.Stat. § 674.103(1), hereinafter § 674.103]. *Western Air & Refrigerataion v. Metro Bank of Dallas*, 599 F.2d 83, 90 (5th Cir.1979). In fact, Comment 2 to § 4–103 specifies that "[l]egends on deposit tickets, *collection letters*, and acknowledgements of items, coupled with action by the affected party constituting acceptance, adoption, ratification, estoppel or the like, are agreements if they meet the tests of the definition of 'agreement.'" (emphasis added). UCC § 1–201(3) defines "agreement" as follows:

> "Agreement" means the bargain of the parties in fact as found in their language or by implication from other circumstances including course of dealing or usage of trade or course of performance as provided in this Act (Sections 1–205 and 2–208). Whether an agreement has legal consequences is determined by the provisions of this Act, if applicable; otherwise by the law of contracts (Section 1–103). (Compare "Contract").

Fla.Stat. 671.201(3). An agreement includes provisions in which there has been acquiescence. *See* R. Anderson, *Uniform Commercial Code*, § 4–103:5 (1971 & Supp.1984).

Applying these principles to the facts in this case, the Court determines that the parties agreed that the instructions in the transfer and collection letters sent by SBI to MSB, including the incorporation of the URC, would govern their responsibilities as to the first bill of exchange. In transmitting the instructions to MSB, SBI was at all times acting as the agent of Gathercrest. The Court's conclusion that there was an agreement is based upon the conduct of the parties and upon the customs of national and international banking. MSB rejected the initial transmission of the first bill of exchange, which listed PMS as the drawee, and promptly returned it stating that the bill was "not in our collection." After communications with the client, Gathercrest and SBI again transmitted the first bill to MSB. The first bill was not returned after the second transmission. In fact, MSB presented the bill for acceptance and released the documents of title upon acceptance. In summary, MSB returned the first bill when it was not willing and/or able to present it for acceptance, but did not return the second transmission of the first bill and presented it. Further, MSB had a duty to promptly return an item wrongly sent to it. *See Citizens State Bank v. Martin*, 227 Kan. 580, 609 P.2d 670, 676, (1980). The Court concludes that the conduct of the parties shows an agreement to present the first bill of exchange, and acquiescence by MSB in the terms specified by SBI.

Plaintiffs' expert testified that it is normal and customary to incorporate the URC in transmittal letters, and that the URC represents the standards of international banking on drafts. No evidence was produced by defendant to contradict this testimony. Therefore, the Court determines that the standards were agreed upon by the parties through their conduct, and were not manifestly unreasonable. *See* Fla.Stat. § 674.103(1). Furthermore, the URC does not allow banks to disclaim responsibility for lack of good faith or failure to exercise ordinary care, and does not limit the measure of damages for such lack or failure. *See* URC Art. 1. Thus, it does not contra-

vene the requirements of UCC § 4–103 (§ 674.103). In summary, the Court concludes that the parties agreed, as that term is defined by the UCC, that the standards specified in the URC should govern their duties with respect to the first bill of exchange, and that an agreement to incorporate the provisions of the URC is permissible under UCC § 4–103 (§ 674.103).

### B. *Definitions*

Before determining the duties and liabilities of the parties, the Court must first determine the definitional labels to be applied to the parties and instruments involved in these two transactions. Determining the correct definitional labels is critical because the duties and liabilities vary with the type of bank and instrument involved.

#### 1. *Documentary Drafts*

The bills of exchange fall within the definition of financial documents under the URC, and the accompanying invoices and bills of lading are commercial documents. Collectively they are referred to simply as documents. URC General Provisions B(1).

Under the UCC, the bills of exchange are drafts. *See* Fla.Stat. § 673.104. The critical issue is whether or not they are documentary drafts. A documentary draft is "any negotiable or non-negotiable draft with accompanying documents, securities or other papers to be delivered against honor of the draft." Fla.Stat. § 674.-104(1)(f). The two bills involved in this case were accompanied by bills of lading and invoices. Thus, the requirement of a draft accompanied by documents has been satisfied. Therefore, the only remaining issue is whether or not the documents were to be delivered against honor of the draft. The instructions specified that the documents accompanying the drafts were to be delivered against acceptance. However, under the UCC, to honor is defined as "to pay or to accept and pay". Fla.Stat. § 671.201(21); *see Wiley v. Peoples Bank and Trust Company*, 438 F.2d 513, 516

(5th Cir.1971). Thus, drafts accompanied by documents deliverable against payment of the crafts clearly fall within the definition of documentary drafts. *See Union Bank of Benton, Arkansas v. First National Bank in Mt. Pleasant, Texas,* 621 F.2d 790, 792–793 (5th Cir.1980); *Wiley v. Peoples Bank and Trust Company,* 438 F.2d at 516; *Memphis Aero Corporation v. First American National Bank,* 647 S.W.2d 219 (Tenn.1983); *New Ulm State Bank v. Brown,* 558 S.W.2d 20 (Tex.Civ. App.—Houston 1977); *Marfa National Bank v. Powell,* 512 S.W.2d 356 (Tex.Civ. App.—El Paso 1974).

 The bills here in question apparently would fall outside the literal definition of a documentary draft because they do not seem to be deliverable against "honor" of the draft, i.e. payment or acceptance *and* payment. However, the sections governing collection of documentary drafts, UCC 4–501 to 4–504. (Fla.Stat. §§ 674.-501–504), contemplate that some documentary drafts will be delivered upon acceptance rather than payment. One commentator has addressed this problem at length:

A question of construction arises as to whether payment is an essential part of honoring within that part of the definition ["to pay or to accept and pay"]. If the word "and" is given literal effect, a drawee does not honor a draft by merely accepting it and does not honor it until payment is thereafter made. It would appear more practical to regard a draft as honored when it is accepted, without regard to payment as long as the time for payment has not arrived and payment has not been refused. That is to say, since a draft may be dishonored by either nonacceptance or nonpayment, it should be deemed honored by acceptance as well as by payment when all that the drawee can be required to do at the time is to accept or refuse to accept. Otherwise stated, an obligation calling for the payment of money should be deemed honored when either it is accepted or when paid according to its terms, rather than hold that honor requires both acceptance "and" payment.

R. Anderson, *Uniform Commercial Code,* § 1–201:71. In view of the language of the UCC sections on collection of documentary drafts, the Court agrees that § 1–201(21) [§ 671.201(21)] should be construed to mean that a draft is honored when it is delivered for acceptance and is accepted, and that payment is not necessarily required in order for a draft to be honored. Therefore, the Court concludes that the two bills are documentary drafts.

### 2. *First Bill of Exchange*

With respect to the first bill of exchange, determining the correct definitional labels is relatively simple. On the first bill, PMS was the original drawee and Kwik Blast was the substituted drawee. MSB is not listed on the face of the instrument, and the transmittal instructions indicate the bill was sent to MSB for presentment for acceptance. Under the URC, Gathercrest is the principal, "the customer entrusting the operation of collection to his bank," and SBI is the remitting bank, the bank to which Gathercrest entrusted the operation of collection. URC General Provisions B(2). MSB is both a collecting bank, which is any bank other than the remitting bank involved in processing the collection order, and a presenting bank, which is the collecting bank making presentation to the drawee. PMS and subsequently Kwik Blast were listed as the drawee, the one to whom presentation is to be made according to the collection order.

Under the UCC, SBI is the depositary bank because it was the first bank to which the bill was transferred for collection. Fla. Stat. § 674.105(1). The amended first bill was drawn against a customer of MSB, and MSB was directed to present the bill for acceptance. Therefore, MSB is both a collecting bank and a presenting bank because it was a bank other than a payor bank which handled the item for collection and presentment. Fla.Stat. § 674.105(4) & (5); *see, e.g., Southern Cotton Oil Company v. Merchants National Bank,* 670 F.2d 548, 550 (5th Cir.1982); *United States For Use*

*and Benefit of Westinghouse v. Sommer,* 580 F.2d 179, 1983 (5th Cir.1978); *Alimenta (U.S.A.), Inc. v. Stauffer,* 568 F.Supp. 674, 677–678 (N.D.Ga.1983).

### 3. *Second Bill of Exchange*

The status of the parties with respect to the second bill of exchange presents the Court with more difficult issues. The critical question is whether MSB was a collecting bank or a payor bank under the UCC. Unlike a collecting bank, which merely handles an item for collection, a payor bank is "a bank by which an item is payable as drawn or accepted." Fla.Stat. § 674.105(2). MSB's status is unclear because it is listed on the bill as drawee, while the transmittal letters list Kwik Blast as the drawee.

Acceptance is defined as "the drawee's signed engagement to honor the draft as presented," and must be written on the draft. Fla.Stat. § 673.410. From the testimony and exhibits produced at trial, the Court concludes that the second bill was never accepted. Since MSB never accepted the second bill, it could be a payor bank only if it was a bank by which the draft was "payable as drawn." Comment 2 to § 674.105 indicates that a payor bank includes a drawee bank. Thus, the Court must determine if MSB was the drawee on the second bill.

The bill was made by Hearn of Pan Aqua, the seller of the goods in the underlying transaction, the section of the bill "To:" lists the name and address of MSB, and the bill orders that the sum be paid to Gathercrest, Ltd. Where a bank is listed on a draft as drawee and a particular customer or account is also specified, some courts have considered the face of the bill ambiguous and have looked to the surrounding facts and circumstances to resolve the ambiguity as to the intended drawee. *See, e.g., Southern Cotton Oil Company v. Merchants National Bank,* 670 F.2d at 550; *Alimenta (U.S.A.), Inc. v. Stouffer,* 568 F.Supp. at 677; *Wilhelm Foods, Inc. v. National Bank of North America,* 382 F.Supp. 605, 609 (S.D.N.Y. 1974); Annot., 84 A.L.R.3d 1073 (1978 & Supp.1984). Other courts have regarded such a draft as designating more than one drawee, and have held that both the designated customer and the bank are drawees.[2] *See e.g., Pecos County State Bank v. El Paso Livestock Auction,* 586 S.W.2d 183 (Tex.Civ.App.—El Paso (1979)); *New Ulm State Bank v. Brown,* 558 S.W.2d at 25; *Engine Parts, Inc. v. Citizens Bank of Clovis,* 92 N.M. 37, 582 P.2d 809, 813 (1978); *see also* R. Anderson, *Uniform Commercial Code* § 4–105:3.

However, in this case the bill lists only the bank as the drawee, and is clear and unambiguous on its face. Therefore, the Court will not look beyond its face. Where the bill is unambiguous, the fact that subsequent transmittal letters or receipts indicate that an item is sent for collection or designate another party as the drawee or payor do not alter the status of the drawee bank.[3] *See Western Air & Refrigeration v. Metro Bank of Dallas,*

---

**2.** In *Horney v. Covington County Bank,* 716 F.2d 335, 338–339 (5th Cir.), *rehearing denied,* 725 F.2d 1006 (1984), a Fifth Circuit panel distinguished these two lines of cases on the facts, pointing out that in those cases where the bank was held to be a drawee the draft was made by that bank's customer or his agent, while in those cases where the bank was not regarded as a drawee the draft was drawn by the payee. The decision in *New Ulm* was the only exception to this pattern. The panel in *Covington County Bank* then held that the bank was at least a co-drawee, and therefore liable as a payor bank. *Id.* at 339. On rehearing, *725 F.2d 1006,* the Court distinguished *Southern Cotton Oil v. Merchants National Bank,* 670 F.2d at 550, by noting that in *Southern Cotton* the draft was drawn by the payee, while in the case before the panel the

bank's customer made the draft. Thus, at least in the new Fifth Circuit the determination of whether a draft listing both the bank and a customer designates the bank as a drawee is dependent upon whether the payee or the bank's customer drew the bill.

**3.** In contrast, where the face of the draft is ambiguous, transmittal letters to the bank stating that the draft is for collection and that the customer is the "payor" have been considered as one factor indicating that the bank is not the drawee. *See Alimenta (U.S.A.), Inc. v. Stouffer,* 568 F.Supp. at 677; *Wilhelm Foods, Inc. v. National Bank of North America,* 382 F.Supp. at 609.

599 F.2d at 90; *see also Engine Parts, Inc. v. Citizens Bank of Clovis*, 582 P.2d at 813. In fact, one commentator has noted in another context that "a payor bank cannot rely on instructions given to it but is always under the duty of making proper payment and is subject to liability for failure to do so." R. Anderson, *Uniform Commercial Code* § 4–203:3. In summary, the Court concludes that the bill is not ambiguous on its face, that MSB is the drawee on the second bill, and that therefore MSB is automatically classified as a payor bank. *See Union Bank of Benton, Arkansas v. First National Bank in Mt. Pleasant, Texas*, 621 F.2d at 793.

## C. Liability

### 1. First Bill of Exchange

Having defined the parties involved in these two transactions, the Court must proceed to determine defendant's duties and liability on each instrument. With respect to the first bill of exchange, MSB was acting as a collecting bank and a presenting bank under both the URC and the UCC. MSB initially was directed to present the bill for acceptance and, after the amended and accepted bill was again sent to it, was instructed to present the bill for payment on April 18.

■ Defendant's conduct in allowing the amendment of the first bill by Hearn of Pan Aqua, releasing the amended bill and releasing the documents of title upon the acceptance of the amended bill were irregular at best and in violation of its duties under the URC and the UCC. Gathercrest's actions subsequent to receipt of the amended bill might be construed as a ratification of the amendment similar to ratification of an unauthorized signature. *See* Fla.Stat. § 673.404. However, when Gathercrest received the accepted amended bill the documents of title had already been released; thus, by attempting to collect the amended bill it was simply attempting to make the best of the situation to which it had been subjected by MSB's actions. MSB failed to advise Gathercrest of the acceptance or non-acceptance of the bill.

Instead, Hearn of Pan Aqua informed Gathercrest of the actions taken with respect to the bill.

After SBI returned the accepted amended bill to MSB to present for payment, MSB again failed to act in compliance with the URC, the UCC and SBI's instructions. MSB failed to seasonably notify plaintiffs that Kwik Blast had dishonored the bill when it became due on April 18. In fact, MSB did not inform plaintiffs that Kwik Blast had failed to pay the bill until after three inquiries by SBI. Further, MSB failed to protest the dishonor when instructed by plaintiffs to do so. Under the URC, however, MSB was not required to take any action with respect to the goods, URC Art. 19; therefore, MSB's failure to attach the goods as requested was not in violation of its duties under the URC.

■ Sections 674.501–.504 of the Florida Statutes govern collection of documentary drafts. MSB was required to seasonably notify plaintiffs of dishonor, Fla.Stat. § 674.501, and to use diligence and good faith to ascertain the reason for dishonor, notify SBI of the dishonor and of the results of its effort to ascertain the reasons therefore, and request instructions. Fla. Stat. § 674.503. MSB failed to comply with any of these duties. Under the UCC, action is taken 'seasonably' when it is taken within a reasonable time. Fla.Stat. § 671.204(3). The expert testimony at trial indicated that seasonable notice of dishonor should be given within one to two weeks. MSB failed to give notice of dishonor until three months after the payment date, and then only after repeated inquiries from SBI. Therefore, the Court concludes that MSB failed to perform its duties with respect to the collection of the first bill of exchange.

If the bill is not a documentary draft, MSB's conduct should be measured by the requirements for a collecting bank under § 674.202(2). Under that section, MSB in this case has the burden of establishing that it acted seasonably; it has failed to carry that burden. *See Pandol Bros., Inc.*

*v. NCNB National Bank of Florida,* 450 So.2d 592 (Fla. 4th DCA 1984). Furthermore, MSB failed to exercise ordinary care in its handling of the bill. *See* Fla.Stat. § 674.202(2). Therefore, the Court concludes that MSB is liable on the first bill under the URC, and under the UCC both as a collecting bank and as a collecting bank handling a documentary draft.

■■■ Relying upon *Wiley, Tate & Imby v. Peoples Bank & Trust Company of Tupelo, Mississippi,* 462 F.2d 179 (5th Cir. 1972), plaintiffs argue that MSB is strictly liable for its failure to seasonably notify plaintiffs of the dishonor of a documentary draft. However, it appears to the Court that the bank in *Wiley* was strictly liable because it was a payor bank rather than because the item involved was a documentary draft. The Court arrives at this conclusion primarily because of the *Wiley* court's citation of the UCC section on payor bank liability. *Id.* at 180. MSB's liability as a collecting bank on the first bill is governed by the provision of UCC § 4–103(5):

> (5) The measure of damages for failure to exercise ordinary care in handling an item is the amount of the item reduced by an amount which could not have been realized by the use of ordinary care, and where there is bad faith it includes other damages, if any, suffered by the party as a proximate consequence.

Fla.Stat. § 674.103(5). "[T]he plaintiffs' measure of damages is the amount they could have collected had the Bank returned the ... drafts seasonably, conversely, if the amounts due were uncollectible in any event, the Bank's negligence caused no damage." *Marcoux v. Van Wyk,* 572 F.2d 651, 653 (8th Cir.), *cert. denied,* 439 U.S. 801, 99 S.Ct. 43, 58 L.Ed.2d 94 (1978); *see Royal Trust Bank of Orlando v. All Florida Fleets, Inc.,* 431 So.2d 1043 (Fla. 5th DCA 1983). *Alimenta (U.S.A.), Inc. v. Stauffer,* 568 F.Supp. at 678. From the evidence at trial, the Court concludes that the bill would not have been uncollectible if plaintiffs had been seasonably notified of its dishonor. The bill was not dishonored

because of lack of funds. Further, during the period of delay, Kwik Blast apparently had goods which plaintiffs might have been able to attach had they been seasonably notified of the dishonor. Therefore, the Court concludes that MSB is liable for the face amount of the £20,253 bill.

### 2. *Second Bill of Exchange*

■■■ As to the second bill, MSB was a payor bank. The liability of a payor bank for late return of an item is set forth in Florida Statutes § 674.302:

> Payor Bank's Responsibility for Late Return of Item. In the absence of a valid defense such as breach of a presentment warranty (subsection (1) of Section 4–207), settlement effected or the like, if an item is presented on and received by a payor bank the bank is accountable for the amount of
>
> (1) a demand item other than a documentary draft whether properly payable or not if the bank, in any case where it is not also the depositary bank, retains the item beyond midnight of the banking day of receipt without settling for it or, regardless of whether it is also the depositary bank, does not pay or return the item or send notice of dishonor until after its midnight deadline; or
>
> (2) any other properly payable item unless within the time allowed for acceptance or payment of that item the bank either accepts or pays the item or returns it and accompanying documents.

Subsection 674.302(1) does not apply in this case because the bill is a documentary time draft rather than a *"demand* item *other* than a documentary draft." *See, e.g., Union Bank of Benton, Arkansas v. First National Bank in Mt. Pleasant, Texas,* 621 F.2d at 794. However, the provisions of subsection 674.302(2) are applicable if the bills are "properly payable." *Id.; Memphis Aero Corporation v. First American National Bank,* 647 S.W.2d at 222–224; *New Ulm State Bank v. Brown,* 558 S.W.2d at 25. Since MSB did not accept the bill, its liability is for failure to timely return the documents rather than on the document itself. *See Peoples Bank in*

*North Fort Myers v. Bob Lincoln, Inc.,* 283 So.2d 400, 402 (Fla. 2d DCA 1973); *Memphis Aero Corporation v. First American National Bank,* 647 S.W.2d at 222; *New Ulm State Bank v. Brown,* 558 S.W.2d at 25.

■ Under § 674.104(1)(i), the term properly payable "includes the availability of funds for payment at the time of decision to pay or dishonor." Courts have differed as to whether or not insufficiency of funds renders an item not "properly payable." *Compare Memphis Aero Corporation v. First American National Bank,* 647 S.W.2d at 223 (not "properly payable") *with Union Bank of Benton, Arkansas v. First National Bank in Mt. Pleasant, Texas,* 621 F.2d at 794–795 ("properly payable"). Although the evidence is circumstantial, the Court finds that the bill was an authorized instrument for which funds were available; therefore, the bill was properly payable as that term is defined by the UCC, regardless of whether or not insufficiency of funds renders a draft not properly payable. The Court infers from the evidence at trial, including MSB's initial rejection of the first bill and subsequent presentment of the bill to Kwik Blast, the MSB memorandum concerning letters of credit, the MSB letter to Kwik Blast, and the trial testimony, that Kwik Blast was a customer of MSB and that the second bill was an authorized instrument. Further, there was absolutely no evidence that funds were not available for payment of the bill. The dispute between Pan Aqua and Kwik Blast which ultimately resulted in dishonor of both drafts involved the fitness of the goods rather than a lack of funds. Based upon these factors and the totality of the evidence produced at trial, the Court concludes that the second draft was a "properly payable" item.

■ Under § 674.302(2), MSB was obligated "within the time allowed for acceptance or payment ... [t]o either accept[ ] or pay[ ] the item or return it and accompanying documents." The Court must next determine whether MSB's failure to either accept or return the second bill for over three months was a failure to act within the time allowed. Section 674.302(2) does not define "time allowed," and the cross reference to § 674.301 in the official comment is of little assistance since § 674.301 does not specify the time allowed for payment of documentary drafts by payor banks. *See Union Bank of Benton, Arkansas v. First National Bank of Mt. Pleasant, Texas,* 621 F.2d at 795 n. 14. Section 674.301(1) does not apply in this case because it pertains to demand items other than a documentary draft, and § 674.301(2) does not apply because it applies to demand items where the payor bank is also the depositary bank. Fla.Stat. § 674.301, Comment 2.

Faced with a similar quandry, other courts attempting to determine if documentary drafts were handled by a payor bank in a timely manner have followed the mandate of UCC § 4–102 (§ 674.102) and looked to other provisions of UCC Articles 3 and 4. However, different provisions of the UCC have been applied in these cases. *See generally* Annot., 22 A.L.R. 4th 10 (1983 & Supp.1984). Some courts have turned to the provisions governing collection of documentary drafts, UCC §§ 4–501 to 4–504 (§§ 674.501–.504), and have indicated that the bank must act seasonably in the return of documentary drafts. *See, e.g., Wiley v. Peoples Bank and Trust Company,* 438 F.2d at 516; *New Ulm State Bank v. Brown,* 558 S.W.2d at 26–27. Based upon the expert testimony, it is clear that MSB did not act seasonably in returning the second bill, and would be liable for its untimely return of the draft under this line of cases.

However, the Fifth Circuit in *Union Bank* looked to the provisions of UCC § 3–506 (§ 673.506) for guidance in determining if a payor bank handles a documentary draft in a timely manner. *Union Bank of Benton, Arkansas v. First National Bank in Mt. Pleasant, Texas,* 621 F.2d at 796; *see also Hamby Company v. Seminole State Bank,* 652 S.W.2d 939 (Tex.1983). Section 3–506 provides in pertinent part:

Acceptance may be deferred without dishonor until the close of the next business day following presentment. The holder may also in a good faith effort to obtain acceptance and without either dishonor of the instrument or discharge of secondary parties allow postponement of acceptance for an additional business day. Fla.Stat. § 673.506(1). Because the time allowed for acceptance under this section is at most two business days after presentment for acceptance, the Court must determine the presentment date.

In determining the presentment date, the Court must look to the nature of the instrument, any usage of banking or trade and the facts of the particular case. Fla.Stat. § 673.503(2); *Union Bank of Benton, Arkansas v. First National Bank in Mt. Pleasant, Texas*, 621 F.2d at 796. Presentment may be made by sending an item directly to the payor bank, Fla.Stat. § 674.-204(2)(a), by mail. Fla.Stat. § 673.504(2)(a). Presentment to MSB was effective even though the accompanying letter indicated the bill was sent for collection. *See Western Air & Refrigeration, Inc. v. Metro Bank of Dallas*, 599 F.2d at 89; *Engine Parts, Inc. v. Citizens Bank of Covington*, 582 P.2d at 815. If presentment is made by mail, the time of presentment is determined by the time of the receipt of the mail. Fla.Stat. § 673.504(2)(a). The evidence produced at trial did not establish the date upon which MSB received the second draft by mail. However, MSB must have received it after June 10, when SBI sent the bill, and before July 2, when the goods were released by the shipper upon presentment of the documents of title. MSB failed to return the second bill and accompanying documents until September 29. Thus, although the Court is unable to determine the precise date of presentment, it is clear that the documents were returned months after the time allowed for acceptance or return under the *Union Bank* analysis of timely handling. The Court concludes that regardless of which mode of analysis is applied, MSB returned the bill in an untimely manner. Therefore, MSB is strictly liable under § 674.302(2) for the face amount of the £29,851 second bill of exchange.

## D. *Exchange Rate*

One of the major issues in the case is the proper exchange rate to be applied in changing the amount of the bills from British pounds to United States dollars. Plaintiffs contend that they are entitled to recover judgment based upon the exchange rates prevailing on the dates of breach, which plaintiffs regard as the due date of each bill. Defendant argues that judgment should be based on the exchange rate prevailing on the date of judgment.

This issue turns on the interpretation of the United States Supreme Court decisions in *Hicks v. Guinness*, 269 U.S. 71, 46 S.Ct. 46, 70 L.Ed. 168 (1925) and *Deutsch Bank Filiale Nurnberg v. Humphrey*, 272 U.S. 517, 47 S.Ct. 166, 71 L.Ed. 383 (1926). In the most recent decision interpreting those cases, the Court of Appeals for the First Circuit, reviewing all prior case law, concluded that the proper reading of *Hicks* and *Deutsch Bank* is as follows:

> The judgment day rule applies only when the obligation arises entirely under foreign law. If, however, at the time of breach the Plaintiff has a cause of action arising in this country under American law, the breach day rule applies.

*In Re Goodhope Chemical Corp.*, 747 F.2d 806, 811 (1st Cir.1984); *see Jamaica Nutrition Holdings, Ltd. v. United Shipping Company*, 643 F.2d 376 (5th Cir. Unit A 1981).

In this case, plaintiffs' claims arose under American law. Therefore, the proper exchange rates are those which were in effect at the time of defendant's breach of duty. As to the first bill, the most serious breach was MSB's failure to give timely notice of dishonor. The evidence at trial indicated that notice was untimely one or two weeks after dishonor. Therefore, the date of breach was approximately two weeks after April 18, 1980, or May 2, 1980. The evidence produced at trial shows that the exchange rate was between $2.20 and

$2.40 during the period from April, 1980 to September, 1980. Because of the ambiguity in plaintiffs' proof, the Court will apply the lower rate of $2.20 as the exchange rate for the first bill. As to the second bill, the Court finds that the time of breach was the time of MSB's failure to accept or timely return the second bill sometime during late June through mid-July, 1980. Use of a date prior to the due date of the second bill is proper because MSB is liable for failure to timely return the draft rather than on the instrument itself. Again, due to the ambiguity of plaintiffs' proof the Court will apply the lower exchange rate of $2.20.

### E. *Pre-Judgment Interest and Attorney's Fees*

In this diversity action, Florida law governs both the recoverability and rate of pre-judgment interest. *See Perkins State Bank v. Connolly*, 632 F.2d 1306, 1319–1320 (5th Cir.1980); *Plantation Key Developers, Inc. v. Colonial Mortgage Company of Indiana, Inc.*, 589 F.2d 164, 170 (5th Cir.1979); *Union Bank of Benton, Arkansas v. First National Bank in Mt. Pleasant, Texas*, 677 F.2d 1074, 1076, 1078 (5th Cir.1982); *Arceneaux v. Merrill Lynch, Pierce, Fenner & Smith*, 595 F.Supp. 171, 174 (M.D.Fla.1984). Under Florida law, pre-judgment interest is recoverable both in contract actions and in some tort actions. *Jackson Grain Company v. Hoskins*, 75 So.2d 306 (Fla.1954); *E.S.I. Meats, Inc. v. Gulf Florida Terminal Co.*, 639 F.2d 1348 (5th Cir.1981); *see also Cavic v. Grand Bahama Development Company*, 701 F.2d 879, 888 (11th Cir.1983). Plaintiffs' claims in this action are liquidated. *See, e.g., Typographical Service, Inc. v. Itek Corporation*, 721 F.2d 1317, 1320–1321 (11th Cir. 1983); *Town of Longboat Key v. Carl E. Widell & Son*, 362 So.2d 719, 723 (Fla. 2d DCA 1978); *Fort Pierce Toyota, Inc. v. Wolf*, 345 So.2d 348, 349 (Fla. 4th DCA 1977); Pre-judgment interest has consistently been awarded on UCC 4–302 (§ 674.-302) claims in other jurisdictions. *See, e.g.*, Annot., 22 A.L.R. 4th 10 (1983 & Supp. 1984).

In this action, plaintiffs' claims are liquidated and sound in contract or, alternatively, are liquidated statutory claims in the nature of contract or in the nature of tort based on a contractual relationship. Therefore, pre-judgment interest is recoverable under Florida law. The applicable pre-judgment interest rate is 6% per annum through June 30, 1982, and 12% per annum from July 1, 1982 to the date of judgment Fla.Stat. § 687.01; *see Erskine Florida Properties, Inc. v. Hartwell*, 451 So.2d 976 (Fla. 4th DCA 1984); *Meigs & Cope Agency of Florida v. Koffey*, 435 So.2d 867, 868 (Fla. 3d DCA 1983).

Finally, plaintiffs also have demanded attorney's fees. This issue is governed by Florida law. *Perkins State Bank v. Connolly*, 632 F.2d at 1310–1311. Under Florida law, attorney's fees are awarded to a prevailing party as an element of costs only where provided for by contact or statute or where awarded for services performed in creating or bringing into court a fund or other property. *See, e.g., Kittel v. Kittel*, 210 So.2d 1 (Fla.1968). Of these three theories, the only arguable basis for an award of attorney's fees is that the legislature intended to include authorization for attorney's fees in § 674.103(5) and § 674.302. In Florida, however, statutory provisions awarding attorney's fees as costs are considered in derogation of the common law and are strictly construed. *See, e.g., Kittel v. Kittel*, 210 So.2d at 3 n. 7; *Florida National Bank v. Alfred and Ann Goldstein Foundation*, 327 So.2d 110, 111 (Fla. 1st DCA 1976); *Perkins State Bank v. Connolly*, 632 F.2d at 1313. No Florida court has determined whether attorney's fees can be awarded under either of these sections, although the former Fifth Circuit in dictum indicated that § 674.103 "arguably contemplate[s]" awards of attorney's fees. *Perkins State Bank v. Connolly*, 632 F.2d at 1313. Courts in other jurisdictions have refused to award attorney's fees under UCC § 4–302 (§ 674.302). *See* Annot., 22 A.L.R. 4th at 30–31. The Court upon review of the

statutory language and the official comment to the UCC concludes that Florida law requires a stronger showing of legislative intent before attorney's fees may be awarded under a statute.

Attorney's fees also may be awarded as an element of damages incident to certain actions such as an action in indemnity. *See Perkins State Bank v. Connolly*, 632 F.2d at 1315. Arguably, § 674.103(5), which provides for consequential damages upon a finding of bad faith, could be interpreted to allow for attorney's fees as an element of consequential damages. However, attorney's fees are not specified in the statute or the official comment. Further, in *Florida National Bank at Gainesille v. Alfred and Ann Goldstein Foundation, Inc.*, 327 So.2d at 111, the Court held that UCC 5–115 (§ 675.5–115, re-numbered § 675.-115), which provides for incidental damages, does not allow for an award of attorney's fees as costs or damages. Based upon the statute, official comment and analogous case law, the Court concludes that under Florida law attorney's fees are not included in consequential damages under § 674.103(5). Furthermore, an award of attorney's fees would not be appropriate in this case because MSB did not act in bad faith. Upon review of § 674.302, and the official comment, the Court concludes that attorney's fees also are not available as an element of damages under that section. *See generally* Annot., 22 A.L.R. 4th at 30–31.

### CONCLUSION

In summary, the Court concludes that FABT, as successor in interest to MSB, is liable for the face amount of the two bills of exchange in United States currency at the exchange rate in effect on the date of breach, and for pre-judgment interest and allowable costs. Judgment shall be entered for plaintiffs Gathercrest and SBI; however, the Court notes that SBI suffered no damages except as the agent of Gathercrest. Therefore, it is

ORDERED that the Clerk shall enter judgment for plaintiffs in the amount of $110,228.80 plus pre-judgment interest on the first bill at 6% per annum from May 2, 1980 to June 30, 1982 and 12% per annum from July 1, 1982 to the date of judgment, and pre-judgment interest on the second bill at 6% per annum from July 15, 1980 to June 30, 1982 and 12% per annum from July 1, 1982 to the date of judgment. Plaintiffs also are entitled to their costs in this action.