**WELLS FARGO BANK, N.A.,**
Appellant/Cross–Appellee,

v.

**CITIZENS BANK OF TEXAS, N.A.,**
Appellee/Cross–Appellant.

No. 10–04–00268–CV.

Court of Appeals of Texas,
Waco.

Nov. 23, 2005.

Craig T. Enoch, Winstead Sechrest & Minick, Austin, for Appellant/Cross–Appellee.

Renee F. McElhaney & William F. Hulse IV, Cox Smith & Matthews Inc., San Antonio, for Appellee/Cross–Appellant.

Before Chief Justice GRAY, Justice VANCE, and Justice REYNA.

## OPINION

FELIPE REYNA, Justice.

Citizens Bank of Texas, N.A. filed suit against Pate & Pate Enterprises, Inc. and other related entities after the defendants engaged in a check kiting scheme involving accounts with Citizens Bank, Wells Fargo Bank Texas, N.A., and Wells Fargo Bank Ohio, N.A., resulting in overdrafts at Citizens Bank totaling $8,150,000. Citizens Bank amended its petition to name the Wells Fargo banks as defendants. Citizens Bank settled with the Pate defendants, and the court heard its remaining claims in a bench trial. The court rendered judgment in favor of Citizens Bank.

Wells Fargo Texas, through its successor in interest Wells Fargo Bank, N.A., contends in six issues that the court erred by: (1) holding Wells Fargo Texas liable for failing to timely return unpaid checks drawn on a Wells Fargo Ohio account; (2) finding that Wells Fargo Texas breached a duty of good faith to Citizens; (3) imposing duties on Wells Fargo Texas more stringent than the requirements of the U.C.C. or Regulation CC; (4) finding that Wells Fargo Texas breached a duty of ordinary care; (5) awarding damages for breach of duty of ordinary care; and (6) finding that $892,333 which had been garnished from Wells Fargo Texas was only a conditional setoff against the judgment.

Citizens Bank contends in its sole cross-issue that it established as a matter of law that Wells Fargo Texas promised to treat all checks drawn on any Wells Fargo bank as having been drawn on Wells Fargo Texas and that the court's finding to the contrary is against the great weight and preponderance of the evidence.

We will reverse and render.

## Factual Background

The Pate defendants are in the pipeline construction business. They have maintained accounts with Citizens Bank since the early 1990's. Citizens Bank established a correspondent banking relationship with Wells Fargo Texas's predecessor in interest Norwest Bank Texas, N.A. in 1997. Under this relationship, Norwest was responsible for processing checks deposited with Citizens Bank and handling those checks for collection. Wells Fargo Texas assumed these responsibilities when it consolidated with Norwest in 1999.

In 1998, Norwest established a "controlled disbursement account" for the Pate defendants. Wells Fargo Texas continued this account when it consolidated with Norwest. Under this arrangement, the Pate defendants wrote checks on a Wells Fargo Ohio bank account with a zero balance. Whenever a check was presented for payment from the Ohio account, Wells Fargo Services Co. would electronically transfer funds in that amount from the Pate defendants' Wells Fargo Texas account to Wells Fargo Ohio to cover the check.

The parties dispute the purposes and legitimacy of controlled disbursement accounts. Nevertheless, it is undisputed that the effect of the Pate defendants' controlled disbursement account was to extend the check collection process. This resulted from the manner in which Wells Fargo Texas processed checks written on the Ohio account. For the Ohio checks, Wells Fargo Texas delivered the checks to the Federal Reserve Bank in Houston, which forwarded the checks to the Federal Reserve Bank in Ohio. The Federal Reserve Bank in Ohio then presented the checks to Wells Fargo Ohio for payment. Thus, Wells Fargo Texas held funds in the Pate defendants' account longer than it would have if the Pate defendants had written checks from a Wells Fargo Texas account.[1]

The dispute in this case focuses on sixteen checks totaling $8,150,000 which the Pate defendants wrote on the Ohio account and deposited with Citizens Bank. Under the terms of the correspondent banking agreement, Citizens Bank delivered these checks to Wells Fargo Services Co., which handled check processing services for Wells Fargo Texas. Wells Fargo Services processed these checks via the Federal Reserve Banks in Houston and Ohio as described. Because of concerns that the Pate defendants were engaged in a check kiting scheme,[2] Wells Fargo Texas decided to place a hold on the funds in the Pate defendants' accounts.

Wells Fargo Ohio returned the checks to Citizens Bank unpaid. On receiving notice that these checks were dishonored, Citizens Bank was able to return $2,728,375 of the checks to Wells Fargo Texas. However, because of the delay resulting from the checks being processed through the controlled disbursement account in Ohio, Citizens Bank was unable to return nearly $3,000,000 of the checks.[3] Citizens Bank suffered about $5,000,000 in losses from the Pate defendants' overdrawn checks.

## Procedural Background

Citizens Bank alleges that Wells Fargo Texas owed it a duty of good faith because of their correspondent banking relation-

1. Checks written from a Wells Fargo Texas account and presented to the same bank (other than "for immediate payment over the counter") would be treated as "on-us" items. *See* TEX. BUS. & COM.CODE ANN. §§ 4.105(2), 4.302(a)(1) & cmt. 1 (Vernon 2002). The U.C.C. requires more expedited processing for "on-us" items.

2. [C]heck kiting occurs when a "kite artist" uses checks drawn on his or her account at one bank to cover checks written on his or her account at another bank, and vice versa, so that a circle is created in which no money is actually being deposited in either

bank. Check kiting is illegal, and it requires the grant of immediate credit from both banks on the deposited checks from the other bank. Once one of the banks refuses to grant immediate credit ..., the kite collapses.
*Tex. First Natl. Bank v. Ng*, 167 S.W.3d 842, 849 n. 6 (Tex.App.-Houston [14th Dist.] 2005, no pet. h.).

3. Citizens Bank would have lost about $2,000,000 even if it had been able to return this additional $3,000,000 in checks.

ship.[4] Citizens Bank alleges that Wells Fargo Texas breached this duty by:

(1) implementing the controlled disbursement account which "encouraged and facilitated the possibility of bank fraud";

(2) "failing to disclose to Citizens Bank the extra risk created by these accounts, and by intentionally shifting to Citizens Bank the losses they created by placing holds on the accounts, continuing to accept deposits and by returning checks unpaid to Citizens Bank, especially when there were funds remaining in the account to cover at least some of the checks returned";

(3) using its superior knowledge of information about the Pate defendants and Citizens Bank to its advantage;

(4) failing to expedite the check collection process as required by contract and federal regulation; and

(5) giving Citizens Bank late notice of non-payment.

Citizens Bank contends that Wells Fargo Texas is strictly liable under the U.C.C. for:

(1) failing to give timely notice of non-payment; and

(2) providing defective notice of non-payment by listing one dishonored check as being in the amount of $50,000 rather than $500,000.

Citizens Bank also alleges that Wells Fargo Texas is liable for misrepresenting the status of the Pate Enterprises account and for breach of the warranty of presentment by presenting cashier's checks to Citizens Bank for payment which had not been properly endorsed.

■ The court found that Wells Fargo Texas:[5] (1) failed to timely return the checks; (2) breached the duty of good faith it owed under the U.C.C. and Regulation CC; and (3) breached the duty of disclosure it owed to Citizens Bank as its correspondent bank. The court rejected Citizens Bank's breach of contract claim. The court awarded Citizens Bank $4,654,792 in damages, prejudgment interest, $870,676 in trial attorney's fees, appellate attorney's fees, and court costs. In the alternative (if the judgment is reversed on the theory that Wells Fargo Texas and Wells Fargo Ohio must be treated as separate legal entities), the court found that Wells Fargo Ohio acted as an agent for Wells Fargo Texas and awarded Citizens Bank $2,947,973, which represents the additional amount of checks Citizens Bank could have returned if it had received earlier notice that the checks had been dishonored.

## Controlled Disbursement Accounts

The trial court found that "Wells Fargo Texas set up the Ohio account for the

---

**4.** Citizens Bank makes similar allegations against Wells Fargo Ohio, but we focus here on the allegations against Wells Fargo Texas, the sole appellant.

**5.** Because only "Wells Fargo Bank, N.A., successor in interest to Wells Fargo Bank Texas, N.A." perfected an appeal, Citizens Bank contends that Wells Fargo Texas cannot complain of any adverse findings regarding Wells Fargo Ohio. We disagree. The court's primary finding of liability focuses on the acts and omissions of Wells Fargo Texas both alone and through Wells Fargo Ohio (for which the court held Wells Fargo Texas liable under a single business enterprise theory). The court's alternative finding, which assumes that Wells Fargo Texas and Wells Fargo Ohio must be treated as separate legal entities, likewise holds Wells Fargo Texas liable for the acts and omissions of Wells Fargo Ohio, this time under an agency theory. Because Wells Fargo Texas was held liable at least in part because of the acts and omissions of Wells Fargo Ohio, we conclude that Wells Fargo Texas may challenge any adverse findings regarding Wells Fargo Ohio.

purpose of evading or extending the time limits set forth in the UCC and Reg[ulation] CC." Thus, the court implicitly found that the Ohio account was a delayed disbursement account, which is disfavored by the Federal Reserve, rather than a controlled disbursement account as Wells Fargo Texas contends.

Under the typical scenario, a controlled disbursement account is a checking account with a zero balance held by a corporation. When a check written on this account is presented for payment, funds from an interest-bearing account are transferred to the zero balance account to pay the check.[6] *See e.g. Schering–Plough Healthcare Prods., Inc. v. NBD Bank, N.A.,* 98 F.3d 904, 910 (6th Cir.1996); *RPM Pizza, Inc. v. Bank One Cambridge,* 869 F.Supp. 517, 518–19 (E.D.Mich.1994).

Banks offering controlled disbursement services notify their corporate customers early in the day of the amount of the corporation's check payments that have been presented that day so that the corporation can invest surplus balances or borrow additional funds, as necessary, while money markets are still active. U.S. money markets become progressively less liquid after noon Eastern Time.

*Collection of Checks and Other Items by Federal Reserve Banks and Availability of Funds and Collection of Checks,* 63 Fed. Reg. 12700, 12702 n. 6 (Mar. 16, 1998).

Controlled disbursement accounts are strikingly similar to delayed (or remote) disbursement accounts, the use of which was sharply criticized as "an abuse of the check collection system" by the Comptroller of the Currency in 1979. Comptroller

of the Currency, Banking Circular No. 121, 1979 OCC CB LEXIS 11 at *1 (Feb. 7, 1979). The Federal Reserve continues to view such accounts with disfavor.

*General policy.* Delayed disbursement (sometimes referred to as "remote" disbursement) is the practice of issuing checks that are payable by, through, or at a bank located in a geographic area such that collection of the checks is generally delayed. For example, these arrangements may be designed to delay the collection and payment of checks by drawing checks on banks located substantial distances from the payee or outside of Federal Reserve cities when alternate and more efficient payment arrangements are available.

The Board is concerned that delayed disbursement practices reduce the efficiency of the check collection system. Drawing a check on a bank remote from the payee often increases the costs of handling the check. More institutions are likely to handle the check before it is finally paid, increasing processing costs, and higher transportation costs are incurred to move checks greater distances. In addition, delays in collection time can impose float costs on depositary banks. Furthermore, delayed disbursement practices delay the return of unpaid checks, increasing the possibilities for check fraud and other losses.

The Board believes the banking industry has a public responsibility not to design, offer, promote, or otherwise encourage the use of a service that is intended to delay payment and that exposes payment recipients and depositary banks to greater-than-ordinary risks.

**6.** Controlled disbursement accounts were devised in part because for-profit organizations are prohibited by statute from earning interest on checking accounts (*i.e.* demand deposits). *See* 12 U.S.C.A. § 1832(a)(2) (West 2001); *Phillips v. Wash. Leg. Found.,* 524 U.S. 156, 161, 118 S.Ct. 1925, 1928, 141 L.Ed.2d 174 (1998); *Paulsen v. St. Bar of Tex.,* 55 S.W.3d 39, 42 (Tex.App.-Austin 2001, pet. denied).

The Board urges the nation's banks and check-related service providers to eliminate delayed disbursement practices intended to obtain extended float.

There is no intention to discourage corporate disbursement arrangements with banks that provide for improved control over daily cash requirements, provided that these arrangements do not result in the undesirable effects noted above. Banks should provide the cash management services needed by their customers through the use of payments [sic] methods that facilitate prompt funds availability to payment recipients and that protect banks from unnecessary risk.

*Policy Statement on Delayed Disbursement,* 64 Fed.Reg. 51762, 51762 (Sept. 24, 1999) (footnote omitted).

The differentiation between the disfavored delayed disbursement accounts and legitimate controlled disbursement accounts appears to lie in the intended purpose of the account when created. The former have been referred to as accounts which are "intended to obtain extended float" or "designed expressly to delay payment." *See id.;* Banking Circular No. 121, 1979 OCC CB LEXIS 11 at *1. Conversely, the Federal Reserve has recognized that the aim of legitimate controlled disbursement accounts is "not the ability to generate float, but the ability to make investment and borrowing decisions early in the day based on knowledge of the value of that day's check presentments." *Collection of Checks and Other Items by Federal Reserve Banks and Availability of Funds and Collection of Checks,* 63 Fed.Reg. 68701, 68702 (Dec. 14, 1998).

Regardless of the characterization however, delayed disbursement accounts are not, strictly speaking, unlawful.

## Standard of Review

Findings of fact in a bench trial have the same force and dignity as a jury's verdict upon jury questions. *Anderson v. City of Seven Points,* 806 S.W.2d 791, 794 (Tex. 1991). When challenged on appeal, the findings are not conclusive on the appellate court if there is a complete reporter's record, as there is here. *Zac Smith & Co. v. Otis Elevator Co.,* 734 S.W.2d 662, 666 (Tex.1987); *In re K.R.P.,* 80 S.W.3d 669, 673 (Tex.App.-Houston [1st Dist.] 2002, pet. denied). Generally, we will not disturb a trial court's findings if there is evidence of probative force to support them. *See Ski River Dev., Inc. v. McCalla,* 167 S.W.3d 121, 136–37 (Tex.App.-Waco 2005, pet. filed); *Barrientos v. Nava,* 94 S.W.3d 270, 288 (Tex.App.-Houston [14th Dist.] 2002, no pet.).

Although we show deference to a trial court's findings, those findings are reviewable for legal and factual sufficiency of the evidence by the same standards that are applied in reviewing evidence supporting a jury's answers. *Catalina v. Blasdel,* 881 S.W.2d 295, 297 (Tex.1994); *Dominguez v. Castaneda,* 163 S.W.3d 318, 325 (Tex.App.-El Paso 2005, pet. denied). We review the trial court's conclusions of law *de novo. Dominguez,* 163 S.W.3d at 325. Under *de novo* review, the reviewing court exercises its own judgment and redetermines each legal issue. *Quick v. City of Austin,* 7 S.W.3d 109, 116 (Tex.1998).

A finding may be disregarded if it is not supported by the evidence or is immaterial. *See S.E. Pipeline Co. v. Tichacek,* 997 S.W.2d 166, 172 (Tex.1999); *Anderson, Greenwood & Co. v. Martin,* 44 S.W.3d 200, 216 (Tex.App.-Houston [14th Dist.] 2001, pet. denied). A finding on a question is immaterial if the question should not have been submitted to the factfinder or if it has been rendered immaterial by other findings. *Id.*

## Payor Bank

■ Wells Fargo Texas contends in its first issue that the court erred by holding it liable for failing to timely return the unpaid checks because: (1) Wells Fargo Texas did not owe the duties of a payor bank for those checks as a matter of law; (2) Wells Fargo Texas and Wells Fargo Ohio were separate banks; and (3) Wells Fargo Texas and Wells Fargo Ohio were not a single business enterprise.

Because Wells Fargo Texas contends that it did not owe the duties of a payor bank "as a matter of law," we construe its first issue as an assertion that there is no evidence to support the court's express and implied findings pertinent to the role Wells Fargo Texas played in processing the checks in dispute and pertinent to the relationship between Wells Fargo Texas and Wells Fargo Ohio.[7] *See Beard v. Beard,* 49 S.W.3d 40, 54–55 (Tex.App.-Waco 2001, pet. denied).

Wells Fargo Texas contends that we should not look beyond the four corners of the checks to determine the identity of the payor bank. Citizens Bank responds that we should look beyond the face of the checks and consider the close relationship between Wells Fargo Texas and Wells Fargo Ohio.

A "payor bank" is "a bank that is the drawee of a draft." Tex. Bus. & Com.Code Ann. § 4.105(3) (Vernon 2002). The "drawee" is the "person ordered in a draft to make payment." *Id.* § 3.103(a)(2) (Vernon Supp.2004–2005). In this case, the "drafts" are the sixteen checks at issue. *Id.* 3.104(f) (Vernon 2002).

Regulation CC[8] uses the term "paying bank" rather than "payor bank." 12 C.F.R. § 229.2(z) (2005). Regulation CC defines a "paying bank" in pertinent part as "the bank at which a check is payable and to which it is sent for payment or collection." *Id.* § 229.2(z)(2) The term "includes . . . the bank whose routing number appears on a check in fractional or magnetic form and to which the check is sent for payment or collection." *Id.* § 229.2(z).

Several courts have discussed the "four corners rule" advocated by Wells Fargo Texas. *See Gathercrest, Ltd. v. First Am. Bank & Trust,* 649 F.Supp. 106, 116–17 (M.D.Fla.1985), *aff'd,* 805 F.2d 995 (11th Cir.1986); *SCADIF, S.A. v. First Union Natl. Bank,* 208 F.Supp.2d 1352, 1368–69 (S.D.Fla.2002), *aff'd,* 344 F.3d 1123 (11th Cir.2003); *Engine Parts, Inc. v. Citizens Bank of Clovis,* 92 N.M. 37, 582 P.2d 809, 812–13 (1978); *Bank of Am., N.T. & S.A. v. David W. Hubert, P.C.,* 153 Wash.2d 102, 101 P.3d 409, 414–15 (2004); *see also Horney v. Covington County Bank,* 716 F.2d 335, 338–39 (5th Cir.1983).

The rule which has emerged from these decisions is that courts should not stray from the four corners of a check to determine the respective roles of the parties to a check, unless the check is ambiguous on its face. *See Gathercrest,* 649 F.Supp. at 116–17; *Engine Parts,* 582 P.2d at 812–13. The actions of parties to a check transaction cannot alter the respective roles of the

---

7. We construe Wells Fargo Texas's first issue as challenging Findings of Fact No. 46 (single business enterprise), No. 48 (single bank entity; Wells Fargo Ohio not entitled to separate deadline for processing checks), and the court's implied finding that Wells Fargo Texas was the payor bank.

8. 12 C.F.R. pt. 229 (collectively referred to as "Regulation CC") contains the regulations promulgated by the Federal Reserve to implement the Expedited Funds Availability Act, 12 U.S.C.A. §§ 4001–4010 (West 2001 & Supp. 2005). *NBT Bank, N.A. v. First Natl. Community Bank,* 393 F.3d 404, 410–11 (3d Cir. 2004).

parties to an otherwise unambiguous document. *See W. Air & Refrigeration, Inc. v. Metro Bank of Dallas*, 599 F.2d 83, 90 (5th Cir.1979); *Gathercrest*, 649 F.Supp. at 116–17; *Farmers Coop. Livestock Mkt., Inc. v. Second Natl. Bank of London*, 427 S.W.2d 247, 249–50 (Ky.App.1968); *Engine Parts*, 582 P.2d at 812–13; *Bank of Am.*, 101 P.3d at 414.

The checks at issue are unambiguous. Each orders Wells Fargo Ohio to pay the sum indicated, and each provides the physical address (city and state) of Wells Fargo Ohio, its MICR routing number,[9] and the Pate defendants' account number for the account maintained at Wells Fargo Ohio. Therefore, the record contains no evidence to support the court's implied finding that Wells Fargo Texas is the "payor bank" for these checks under section[10] 4.105(3). *Id.* For the same reasons, the record contains no evidence to support the court's implied finding that Wells Fargo Texas is the "paying bank" under Regulation CC. *See* 12 C.F.R. § 229.2(z).

■ Nevertheless, Citizens Bank cites section 4.107 for the proposition that, because Wells Fargo Ohio did not "function as a separate bank" from Wells Fargo Texas, Wells Fargo Ohio should not be accorded the time limits available to a separate bank for processing checks. Section 4.107 provides, "A branch or separate office of a bank is a separate bank for the purpose of computing the time within which and determining the place at or to which action may be taken or notices or orders must be given under this chapter and under Chapter 3." TEX. BUS. & COM. CODE ANN. § 4.107 (Vernon 2002).[11]

Comment 4 to section 4.107 provides in part, "[I]f in its relations to customers a branch functions as a separate bank, notices and orders with respect to accounts of customers of the branch should be given at the branch." *Id.* cmt. 4 (Vernon 2002). Citizens Bank contends that Wells Fargo Ohio does not function as a separate bank with respect to the Pate defendants' account because the decision-making with respect to funding the Ohio account lies with Wells Fargo Texas.

However, the exercise of this decision-making function by the bank holding the funding account is precisely the manner in which controlled disbursement accounts operate. *See e.g. Schering–Plough Healthcare Prods.*, 98 F.3d at 910 (describing workings of zero balance controlled disbursement account). The focus of section 4.107 is on the operations of the bank alleged to not be a separate bank rather than on the "parent" bank.

It is undisputed that Wells Fargo Ohio was a separately chartered bank or that it was a "real bank" with its own officers and tellers. Thus, Wells Fargo Ohio performed the functions of a separate bank and must be treated as a separate bank for

---

**9.** "MICR" stands for magnetic ink character recognition. *IBP, Inc. v. Mercantile Bank of Topeka*, 6 F.Supp.2d 1258, 1265 (D.Kan. 1998). At the bottom of a check, "[t]he MICR encoding consists of a check number, the payor bank's American Bankers Association transit routing number, and the drawer's account number." *Id.*

**10.** Unless otherwise indicated, the term "section" as used hereinafter refers to a section of the Texas Business and Commerce Code.

**11.** The former section 1.201(7) (which applies to this case) defined a "branch" to include "a separately incorporated foreign branch of a bank." Business and Commerce Code, 60th Leg., R.S., ch. 785, § 1, sec. 1.201(7), 1967 Tex. Gen. Laws 2343, 2348 (amended 2003) (current version at TEX. BUS. & COM.CODE ANN. § 1.201(b)(7) (Vernon Supp.2004–2005)). The 2003 amendment only renumbered this statute. Under this definition, Wells Fargo Ohio would appear to qualify as a "branch" of Wells Fargo Texas.

purposes of determining the applicable deadlines for processing checks. *See* TEX. BUS. & COM.CODE ANN. § 4.107; *see also Pulaski Bank & Trust Co. v. Tex. Am. Bank/Fort Worth, N.A.,* 759 S.W.2d 723, 733 (Tex.App.-Dallas 1988, writ denied) ("[e]ven closely-related banks" are each entitled to 24 hours to process a check).

■ As stated, the actions of parties to a check transaction cannot alter the respective roles of the parties to an otherwise unambiguous document. *See W. Air & Refrigeration,* 599 F.2d at 90; *Gathercrest,* 649 F.Supp. at 116–17; *Farmers Coop. Livestock Mkt.,* 427 S.W.2d at 249–50; *Engine Parts,* 582 P.2d at 812–13; *Bank of Am.,* 101 P.3d at 414. The checks at issue are unambiguous. Thus, the court's findings regarding the control Wells Fargo Texas exercised with regard to the Pate defendants' account at Wells Fargo Ohio are immaterial. *See S.E. Pipeline Co.,* 997 S.W.2d at 172; *Anderson, Greenwood & Co.,* 44 S.W.3d at 216.

■ Wells Fargo Texas next challenges the court's finding that Wells Fargo Ohio and Wells Fargo Texas "operated as a single business enterprise." According to the single business enterprise theory, "when two corporations are not operated as separate entities but instead integrate their resources to achieve a common business purpose, it may be equitable, under exceptional circumstances, to hold each constituent corporation liable for the debts and liabilities incurred in the common enterprise." *N. Am. Van Lines, Inc. v. Emmons,* 50 S.W.3d 103, 120 (Tex.App.-Beaumont 2001, pet. denied).

Citizens Bank is correct that the record contains evidence that Wells Fargo Texas and Wells Fargo Ohio acted jointly with respect to checks written on the Pate defendants' account. However, the banks' conduct in these transactions does not al-

ter their respective roles with regard to the checks at issue. *See W. Air & Refrigeration,* 599 F.2d at 90; *Gathercrest,* 649 F.Supp. at 116–17; *Farmers Coop. Livestock Mkt.,* 427 S.W.2d at 249–50; *Engine Parts,* 582 P.2d at 812–13; *Bank of Am.,* 101 P.3d at 414. Thus, the court's finding that Wells Fargo Texas and Wells Fargo Ohio acted as a single business enterprise is immaterial. *See S.E. Pipeline Co.,* 997 S.W.2d at 172; *Anderson, Greenwood & Co.,* 44 S.W.3d at 216.

■ Citizens Bank also suggests that the checks should be treated as "payable through" items under section 4.106. Section 4.106 provides in pertinent part:

> (a) If an item states that it is "payable through" a bank identified in the item, the item:
>
> > (1) designates the bank as a collecting bank and does not by itself authorize the bank to pay the item; and
> >
> > (2) may be presented for payment only by or through the bank.

TEX. BUS. & COM.CODE ANN. § 4.106(a) (Vernon 2002).

> As comment 1 to this section explains,
>
> Some items are made "payable through" a particular bank. Subsection (a) states that such language makes the bank a collecting bank and not a payor bank. An item identifying a "payable through" bank can be presented for payment to the drawee only by the "payable through" bank. The item cannot be presented to the drawee over the counter for immediate payment or by a collecting bank other than the "payable through" bank.

*Id.* cmt. 1 (Vernon 2002).

The checks at issue do not state that they are "payable through" Wells Fargo Ohio. Under section 4.106, "payable through" checks must be presented to the

drawee bank by the payable through bank. Therefore, if Wells Fargo Ohio was a "payable through" bank for the checks, then the checks would have to be first routed through Wells Fargo Ohio for presentment and could not be presented to Wells Fargo Texas for payment by Citizens Bank. *See id.* It is undisputed that the checks were not processed in this manner. Thus, the record contains no evidence that the checks are "payable through" items or that the parties treated the checks as "payable through" items.

Accordingly, we sustain Wells Fargo Texas's first issue.

### Correspondent Bank

Wells Fargo Texas contends in its second issue that the court erred by holding that it breached a duty of expeditious return and a duty of good faith owed to Citizens Bank because (1) Wells Fargo Texas did not owe the duties of a payor bank as a matter of law and (2) Wells Fargo Texas had no contractual duty to expedite the collection of the checks. Wells Fargo Texas contends in its third issue that the court erred by imposing duties on Wells Fargo Texas more stringent than the requirements of the U.C.C. or Regulation CC. Wells Fargo Texas contends in its fourth issue that there is no evidence or factually insufficient evidence to support the court's finding that it breached the duty of ordinary care it owed as a collecting bank.[12]

Citizens Bank contends in its sole cross-issue that the evidence establishes as a matter of law that Wells Fargo Texas agreed to treat all Wells Fargo checks as being drawn on Wells Fargo Texas and that the court's finding to the contrary is against the great weight and preponderance of the evidence.[13]

We construe Wells Fargo Texas's second issue as an assertion that there is no evidence to support the court's findings that Wells Fargo Texas breached its duty of expeditious return under Regulation CC and its duty of good faith under the UCC.[14]

We construe Wells Fargo Texas's third issue as a challenge to the court's conclusion of law that Wells Fargo Texas owed a duty of expeditious return under Regulation CC.[15]

We have already determined that the record contains no evidence to support the court's implied finding that Wells Fargo Texas is the "payor bank" (or paying bank) for these checks. To resolve these issues, we must determine: (1) the roles Wells Fargo Texas and Citizens Bank played in these transactions; (2) the nature of their correspondent banking relationship; (3) and the duties Wells Fargo Texas and Wells Fargo Ohio owed in these transactions.

When the Pate defendants deposited each of the sixteen Wells Fargo Ohio checks in their Citizens Bank account, Citizens Bank became the "depositary bank"

---

12. We construe Wells Fargo Texas's fourth issue as a challenge to Finding of Fact No. 41 ("Wells Fargo Texas delayed the forward collection process").

13. The cross-issue appears to challenge Findings of Fact Nos. 60 through 65, inclusive.

14. We construe Wells Fargo Texas's second issue as challenging Findings of Fact No. 43 (good faith) and No. 44 (expeditious return).

15. We construe Wells Fargo Texas's second issue as challenging Conclusions of Law Nos. 77 through 85, to the extent these conclusions determine that Wells Fargo Texas owed a duty of expeditious return under Regulation CC and breached that duty.

as to each check.[16] *See* TEX. BUS. & COM. CODE ANN. § 4.105(2) (Vernon 2002); *Pulaski Bank & Trust Co.,* 759 S.W.2d at 725. When Citizens Bank delivered the checks to Wells Fargo Texas for collection, Wells Fargo Texas became an "intermediary bank."[17] *See* TEX. BUS. & COM.CODE ANN. § 4.105(4) (Vernon 2002); *Pulaski Bank & Trust Co.,* 759 S.W.2d at 726. Citizens Bank and Wells Fargo Texas were both "collecting banks."[18] *See* TEX. BUS. & COM. CODE ANN. § 4.105(5) (Vernon 2002); *Pulaski Bank & Trust Co.,* 759 S.W.2d at 726. As we have already observed, Wells Fargo Ohio was the payor bank (but not a "collecting bank"). *See* TEX. BUS. & COM.CODE ANN. § 4.105(3), (5); *Pulaski Bank & Trust Co.,* 759 S.W.2d at 726.

■ Citizens Bank contends that its correspondent banking relationship with Wells Fargo Texas placed a higher duty on Wells Fargo than would otherwise be required as between banks engaged in an arms-length transaction. However, the weight of authority seems to be that "[a] correspondent bank relationship, standing alone, does not create an agency relationship." *Aaron Ferer & Sons, Ltd. v. Chase Manhattan Bank, N.A.,* 731 F.2d 112, 122 (2d Cir.1984); *accord Banco Urquijo, S.A. v. Signet Bank/Md.,* 861 F.Supp. 1220, 1249 (M.D.Pa.1994); *Peavy–Moore Lumber Co. v. First Natl. Bank of Beaumont,* 133 Tex. 467, 128 S.W.2d 1158, 1162 (1939); *Tillman County Bank v. Behringer,* 113 Tex. 415, 257 S.W. 206, 206–08 (1923); *see also* TEX. BUS. & COM.CODE ANN. § 4.201(a)

(Vernon 2002). Nor does a correspondent bank relationship standing alone create a fiduciary relationship. *Aaron Ferer & Sons,* 731 F.2d at 122; *Banco Urquijo,* 861 F.Supp. at 1249; *accord Peavy–Moore Lumber Co.,* 128 S.W.2d at 1162; *Tillman County Bank,* 257 S.W. at 206–08; *see also* TEX. BUS. & COM.CODE ANN. § 4.201(a). Instead, the correspondent bank is the agent of the owner of any item forwarded to it for collection. *See* TEX. BUS. & COM.CODE ANN. § 4.201(a).

■ From a review of the agreements between Citizens Bank and Wells Fargo Texas's predecessor in interest Norwest Bank, this correspondent banking relationship essentially made Citizens Bank a depositor with Wells Fargo Texas. The relationship between a bank and its customer does not usually create a fiduciary relationship. *Wil–Roye Inv. Co. II v. Wash. Mut. Bank, F.A.,* 142 S.W.3d 393, 410 (Tex.App.-El Paso 2004, no pet.); *Fleming v. Tex. Coastal Bank of Pasadena,* 67 S.W.3d 459, 461 (Tex.App.-Houston [14th Dist.] 2002, pet. denied).

■ There is caselaw to the effect that a depositary bank such as Citizens Bank in this case becomes the owner of a check if the bank gives the depositor unrestricted credit for the full amount of the check. *See e.g. Schnitger v. Backus,* 10 Wash.App. 754, 519 P.2d 1315, 1319 (1974); *Pazol v. Citizens Natl. Bank of Sandy Springs,* 110 Ga.App. 319, 138 S.E.2d 442, 445 (1964); *S.*

---

**16.** " 'Depositary bank' means the first bank to take an item even though it is also the payor bank, unless the item is presented for immediate payment over the counter." TEX. BUS. & COM.CODE ANN § 4.105(2) (Vernon 2002); *see also* 12 C.F.R. § 229.2(*o*) (2005) ("Depositary bank means the first bank to which a check is transferred even though it is also the paying bank or the payee.").

**17.** " 'Intermediary bank' means a bank to which an item is transferred in course of collection except the depositary or payor bank." *Id.* § 4.105(4) (Vernon 2002).

**18.** " 'Collecting bank' means a bank handling an item for collection except the payor bank." *Id.* § 4.105(5) (Vernon 2002); *see also* 12 C.F.R. § 229.2(rr) (2005) ("Collecting bank means any bank handling a check for forward collection, except the paying bank.").

*End Bank & Trust Co. v. Nasin,* 147 Conn. 215, 158 A.2d 591, 593 (1960); *Commercial Natl. Bank of Hutchinson, Kan. v. Heid Bros., Inc.,* 226 S.W. 806, 809 (Tex. Civ.App.-El Paso 1920), *rev'd on other grounds,* 240 S.W. 908 (Tex. Comm'n App. 1922, holding approved). In this situation, an intermediary bank in the check collection process becomes the agent of the depositary bank (as owner of the check) rather than the agent of the depositor.

Here, Citizens Bank gave the Pate defendants immediate access to $1,475,000 of the $8,150,000 in dispute by issuing cashier's checks in that amount. Thus, it could be argued that Wells Fargo Texas became the agent of Citizens Bank with respect to the $1,475,000 which the latter made available to the Pate defendants through cashier's checks. However, the U.C.C. changed these common law principles regarding the ownership of items such as checks.

Section 4.201(a) provides:

(a) Unless a contrary intent clearly appears and before the time that a settlement given by a collecting bank for an item is or becomes final, the bank, with respect to the item, is an agent or subagent of the owner of the item and any settlement given for the item is provisional. This provision applies regardless of the form of indorsement or lack of indorsement and even though credit given for the item is subject to immediate withdrawal as of right or is in fact withdrawn; but the continuance of ownership of an item by its owner and any rights of the owner to proceeds of the item are subject to rights of a collecting bank, such as those resulting from outstanding advances on the item and rights of recoupment or setoff. If an item is handled by banks for purposes of presentment, payment, collection, or return, the relevant provisions of this chapter apply even though action of the parties clearly establishes that a particular bank has purchased the item and is the owner of it.

TEX. BUS. & COM.CODE ANN. § 4.201(a).

The Texas Supreme Court has construed section 4.201(a) to mean that, regardless of whether a bank permits the immediate withdrawal of funds for a check which has not yet been collected, ownership of the check remains with the depositor, and the bank is merely the agent for the depositor. *Romo v. Austin Natl. Bank,* 615 S.W.2d 168, 170 (Tex.1981); *see also Alta Vista State Bank v. Kobliska,* 897 F.2d 930, 933 (8th Cir.1990).

Therefore, in the collection process, Wells Fargo Texas acted as an agent for the Pate defendants and not for Citizens Bank. Nevertheless, Wells Fargo Texas had certain duties under the U.C.C. with respect to the collection of the checks.

### Forward Collection

■ As a collecting bank, Wells Fargo Texas owed the duties provided by section 4.202.[19]

(a) A collecting bank must exercise ordinary care in:

(1) presenting an item or sending it for presentment;

---

**19.** Regulation CC provides in pertinent part that "a collecting bank handling a check for forward collection may be liable to a prior collecting bank, including the depositary bank, and the depositary bank's customer." 12 C.F.R. § 229.36(d) (2005). However, the Federal Reserve's interpretive commentary explains that section 4.202 is "not superseded" by Regulation CC and that section 4.202 "continue[s] to apply to the forward collection of a check and may apply to the return of a check." *Id.* pt. 229, app. E, § XXII(D) (2005). Thus, it does not appear that Regulation CC imposes different obligations on a collecting bank than section 4.202 does.

(2) sending notice of dishonor or non-payment or returning an item other than a documentary draft to the bank's transferor after learning that the item has not been paid or accepted, as the case may be;

(3) settling for an item when the bank receives final settlement; and

(4) notifying its transferor of any loss or delay in transit within a reasonable time after discovery thereof.

(b) A collecting bank exercises ordinary care under Subsection (a) by taking proper action before its midnight deadline following receipt of an item, notice, or settlement. Taking proper action within a reasonably longer time may constitute the exercise of ordinary care, but the bank has the burden of establishing timeliness.

(c) Subject to Subsection (a)(1), a bank is not liable for the insolvency, neglect, misconduct, mistake, or default of another bank or person or for loss or destruction of an item in the possession of others or in transit.

TEX. BUS. & COM.CODE ANN. § 4.202 (Vernon 2002).

The " '[m]idnight deadline' with respect to a bank is midnight on its next banking day following the banking day on which it receives the relevant item or notice or from which the time for taking action commences to run, whichever is later." *Id.* § 4.104(a)(10) (Vernon Supp.2004–2005).

The checks at issue were grouped in four batches. The first batch, checks 6922 through 6925, was deposited with Wells Fargo Texas on Monday, March 25 and forwarded by Wells Fargo Texas to the Federal Reserve Bank the next day. The second batch, checks 6926 and 6928 through 6930, was deposited on Tuesday, March 26 but not forwarded until Thursday, March 28 because of a computer malfunction. The third batch, checks 6933 through 6936, was deposited on Wednesday, March 27 and forwarded the next day. The fourth batch, checks 6938 through 6941, was deposited on Thursday, March 28 but not forwarded until Saturday, March 30.

Thus, it is undisputed that Wells Fargo Texas forwarded the first and third batches of checks to the Federal Reserve Bank before its midnight deadline. Therefore, there is no evidence that Wells Fargo Texas failed to "exercise ordinary care" with respect to these checks. *See* TEX. BUS. & COM.CODE ANN. § 4.202(b).

With respect to the second batch, Wells Fargo Texas contends that the one-day delay in forwarding is excused because of the computer malfunction. Section 4.109(b) provides:

Delay by a collecting bank or payor bank beyond time limits prescribed or permitted by this title or by instructions is excused if:

(1) the delay is caused by interruption of communication or computer facilities, suspension of payments by another bank, war, emergency conditions, failure of equipment, or other circumstances beyond the control of the bank; and

(2) the bank exercises such diligence as the circumstances require.

*Id.* § 4.109(b) (Vernon 2002).

Wells Fargo Texas presented uncontroverted evidence that its computer system was malfunctioning on the date the second batch of checks was deposited and that it exercised diligence in locating technicians to restore the system. Thus, although the record contains some evidence to support the court's finding that Wells Fargo Texas failed to exercise ordinary care in forwarding the second batch of checks to the Federal Reserve Bank, the evidence is factually insufficient because the computer

malfunction "excused" Wells Fargo Texas for the one-day delay in forwarding this batch of checks. *Id.*

With respect to the fourth batch of checks, which Wells Fargo Texas forwarded to the Federal Reserve Bank on the Saturday following its Friday midnight deadline, Wells Fargo Texas contends that its delay in forwarding this batch of checks is excused because the checks were still presented to Wells Fargo Ohio on the next banking day (Monday), just as they would have been if they had been forwarded to the Federal Reserve Bank on Friday.

To support this contention, Wells Fargo Texas cites 12 C.F.R. § 229.30(c), which provides an automatic extension of the paying bank's deadline for return or notice of non-payment "to the time of dispatch" if the return or notice is received by the next bank on the next banking day. Wells Fargo Texas suggests that "[i]f such no-harm/no-foul rule applies to the more rigorous return side of the check collection and processing system, surely as a matter of law, it should apply to the less rigorous check forwarding side of the process."

Although this argument in the abstract is attractive, it finds no support in the plain language of section 4.202. Thus, the record contains some evidence and factually sufficient evidence to support the court's finding that Wells Fargo Texas failed to exercise ordinary care in forwarding the fourth batch of checks to the Federal Reserve Bank.

The former section 1.203 provided, "Every contract or duty within this title imposes an obligation of good faith in its performance and enforcement." Business and Commerce Code, 60th Leg., R.S., ch. 785, § 1, sec. 1.203, 1967 Tex. Gen. Laws 2343, 2352 (amended 2003) (current version at TEX. BUS. & COM.CODE ANN. § 1.304 (Vernon Supp.2004–2005)).[20] Citizens Bank contends that Wells Fargo Texas failed to act in good faith because it did not forward the checks by means of the most expeditious route available.

However, section 1.203 does not provide an independent cause of action. *See N. Natl. Gas Co. v. Conoco, Inc.,* 986 S.W.2d 603, 606–07 & n. 2 (Tex.1998); *Fetter v. Wells Fargo Bank Tex., N.A.,* 110 S.W.3d 683, 689 (Tex.App.-Houston [14th Dist.] 2003, no pet.); *John Wood Group USA, Inc. v. ICO, Inc.,* 26 S.W.3d 12, 22 (Tex.App.-Houston [1st Dist.] 2000, pet. denied). Nor can a bank be said to violate its "obligation of good faith" under section 1.203 if it acts in accordance with the requirements of the U.C.C. *See Fetter,* 110 S.W.3d at 691; *Hill v. St. Paul Fed. Bank for Sav.,* 329 Ill.App.3d 705, 263 Ill. Dec. 562, 768 N.E.2d 322, 326 (2002).

As stated, Wells Fargo Texas delivered the first three batches of checks to the Federal Reserve Bank within the time limits required by the U.C.C. Thus, Wells Fargo Texas cannot be said to have violated its "obligation of good faith" with respect to these checks under section 1.203. *Id.*

Several cases suggest that a bank owes a heightened duty of care toward another bank only if: (1) the banks share a fiduciary or confidential relationship; (2) the banks have a contractual relationship; (3) a legal duty requires it; or (4) the defendant bank committed fraud or made a misrepresentation. *See Frost Natl. Bank*

**20.** The 2003 amendment only renumbered this statute. *Compare* TEX. BUS. & COM.CODE ANN. § 1.304 (Vernon Supp.2004–2005) *with* Business and Commerce Code, 60th Leg., R.S., ch. 785, § 1, sec. 1.203, 1967 Tex. Gen. Laws 2343, 2352 (amended 2003). Because the checks at issue were processed in 2002, the amended version of the statute does not apply.

*v. Midwest Autohaus, Inc.*, 241 F.3d 862, 874 n. 7 (7th Cir.2001); *Cumis Ins. Society, Inc. v. Windsor Bank & Trust Co.*, 736 F.Supp. 1226, 1233 (D.Conn.1990); *First Natl. Bank in Harvey v. Colonial Bank*, 898 F.Supp. 1220, 1231 (N.D.Ill.1995).

Here, we have already concluded that the banks' correspondent banking relationship standing alone did not create a fiduciary or confidential relationship. *See Aaron Ferer & Sons*, 731 F.2d at 122; *Banco Urquijo*, 861 F.Supp. at 1249; *Peavy–Moore Lumber Co.*, 128 S.W.2d at 1162; *Tillman County Bank*, 257 S.W. at 206–08. We have already concluded that Wells Fargo Texas complied with its legal duties under the U.C.C. (at least with respect to the first three batches of checks). Citizens Bank does not contend that Wells Fargo Texas acted fraudulently or made a misrepresentation.[21] We now examine the banks' contractual relationship to determine whether it may impose a heightened duty of care on Wells Fargo Texas.

The Master Agreement for Cash Management Services Citizens Bank executed with Wells Fargo Texas's predecessor in interest Norwest Bank provides in pertinent part:

> *Scope of the Services.* The Bank shall provide the Company with the cash management services requested in writing and the Services agreed to by the Bank. The services are described in general terms in separate writings which are specifically incorporated into this Agreement (the "Product Descriptions"). The Company agrees to the terms and conditions contained in the applicable Product Description(s); the

Bank's user guide (the "Guide"), if any, for each Service it requests; and the Bank's terms and conditions applicable to each account affected by the Services (the "Account Terms").

Citizens Bank's account agreement provides in pertinent part, "Any non-cash items tendered for deposit (including items drawn 'on-us') will be given provisional credit only until collection is final...."

Citizens Bank contends that Wells Fargo Texas effectively modified the terms of the account agreement by issuing an "Accelerated Availability Schedule" which states in pertinent part:

> Wells Fargo checks drawn in all states are now treated as "On–Us." See page 4 for details and deadlines. Financial Institution depositors receive 100% immediate availability for On–Us items deposited prior to Noon.

According to the funds availability schedule applicable to checks written on the Wells Fargo Ohio account, funds for a check deposited with Wells Fargo Texas before 2:00 p.m. on a banking day would be "collected and available for use" on the next banking day.

Citizens Bank's Executive Vice–President Debra Mitcham testified that Citizens Bank overrode the usual five-day holds on the Wells Fargo Ohio checks deposited by the Pate defendants because "we knew that they were Wells checks and we knew that they were clearing—or we thought they were clearing sooner." When asked to explain why Citizens Bank thought this, Mitcham responded, "Because, Wells is

---

**21.** It is true that Citizens Bank's allegations about the intent with which Wells Fargo Texas established the Pate defendants' controlled disbursement account (*i.e.*, to create float and delay payment of checks) could be characterized as "fraudulent" within the general understanding of that term. However, to establish that a bank owes a heightened duty of care toward another bank because of fraud or misrepresentation, we believe that it must be shown that the fraud or misrepresentation was directed toward the other bank seeking to impose the heightened duty of care.

Wells, it's an 'on-us' item, and through conversations I had with Mike Moses [an officer at Wells Fargo Texas]."

Mitcham later recounted her conversation with Moses.

Q: Did you talk to Mr. Moses about how soon the checks written on the Ohio account would clear?

A: No.

Q: Go through the clearing process?

A: No, because he told me that they were Wells checks. I just assumed that everything was the same computer system and they would be clearing overnight. . . .

For his part, Moses testified that he negotiated only with a certain Roger Lawrence when the correspondent banking relationship was established with Citizens Bank. He did not recall ever · having a conversation with Mitcham but conceded that it could have happened. However, Moses vehemently denied ever discussing with Mitcham the possibility of treating Wells Fargo Ohio checks as "on-us" items for purposes of settlement because "we would lose our shirt on something like that" and "no bank in the country would do that."

Mitcham testified that she "assumed" the Pate defendants' checks would be cleared sooner based on her conversation with Moses. Moses vehemently denied making any representations to this effect. Thus, Citizens Bank did not establish as a matter of law that Wells Fargo Texas agreed to treat the Pate defendants' Wells Fargo Ohio checks as being drawn on Wells Fargo Texas. Nor is the court's finding to the contrary against the great weight and preponderance of the evidence.

Instead, the Cash Management Services agreement and Citizens Bank's account agreement with Wells Fargo Texas reflect an arms-length correspondent banking relationship. Therefore, because the banks did not share a fiduciary or confidential relationship, because the banks' contractual relationship established only an arms-length relationship, because Wells Fargo Texas fulfilled its legal duties under the U.C.C. (with respect to the first three batches of checks), and because Wells Fargo did not·commit fraud or misrepresentation with respect to Citizens Bank, we hold that Wells Fargo did not owe a heightened duty of care toward Citizens Bank with respect to the first three batches of checks. *See Frost Natl. Bank*, 241 F.3d at 874 n. 7; *Cumis Ins. Society*, 736 F.Supp. at 1233; *First Natl. Bank in Harvey*, 898 F.Supp. at 1231.

With regard to the forward collection process, the record contains no evidence and/or factually insufficient evidence to show that Wells Fargo Texas failed to exercise ordinary care or breached any duties it owed with respect to the first three batches of checks. However, the record contains some evidence and factually sufficient evidence to show that Wells Fargo Texas failed to exercise ordinary care in forwarding the fourth batch of checks.

### Return of the Checks

Upon presentment, Wells Fargo Ohio was accountable for the full amount of the checks if it did "not pay or return [them] or send notice of dishonor until after its midnight deadline." Tex. Bus. & Com.Code Ann. § 4.302(a)(1) (Vernon 2002); *Pulaski Bank & Trust Co.*, 759 S.W.2d at 726. Items are considered "returned" when "sent to the bank's customer or transferor or pursuant to instructions." Tex. Bus. & Com.Code Ann. § 4.301(d)(2) (Vernon 2002).

Regulation CC provides for an extension of this return deadline in certain circumstances.

(c) Extension of deadline. The deadline for return or notice of nonpayment under the U.C.C. or Regulation J (12 CFR part 210), or § 229.36(f)(2) is extended to the time of dispatch of such return or notice of nonpayment where a paying bank uses a means of delivery that would ordinarily result in receipt by the bank to which it is sent—

(1) On or before the receiving bank's next banking day following the otherwise applicable deadline by the earlier of the close of that banking day or a cutoff hour of 2 p.m. or later set by the receiving bank under U.C.C. 4–108, for all deadlines other than those described in paragraph (c)(2) of this section; this deadline is extended further if a paying bank uses a highly expeditious means of transportation, even if this means of transportation would ordinarily result in delivery after the receiving bank's next cutoff hour or banking day referred to above; or

(2) Prior to the cut-off hour for the next processing cycle (if sent to a returning bank), or on the next banking day (if sent to the depositary bank), for a deadline falling on a Saturday that is a banking day (as defined in the applicable U.C.C.) for the paying bank.

12 C.F.R. § 229.30(c) (2005).

The court made two findings of fact pertinent to the alleged delay in the return of the checks by Wells Fargo Ohio.

42. After the Federal Reserve Bank delivered the checks to the processing center for Wells Fargo Ohio in Minneapolis, Wells Fargo Services Co. was responsible for delivering the checks to the Federal Reserve Bank of Minneapolis for return to Citizens Bank within the midnight deadline.... Wells Fargo Service Co. had copies of delivery receipts ... but could not match the receipts to particular items.... All that is known is that the items were delivered to the Federal Reserve Bank by 6:00 p.m. of the day following the midnight deadline (assuming Wells Fargo Ohio as the place of presentment).... The Federal Reserve Bank had records showing the times of delivery, but these were destroyed. Consequently, neither party had direct evidence regarding whether Wells Fargo Ohio timely returned the items in dispute to Citizens Bank.

43. Wells Fargo Texas and Wells Fargo Ohio contend they are entitled to a one-day extension of the midnight deadline under Reg. CC, 12 C.F.R. § 229.30.... The Court finds that the use of Reg. CC to extend the midnight deadline by the correspondent bank in the context of a check kite constitutes bad faith.... Wells Fargo Texas breached its duty of good faith by using Reg. CC as a means of extending the midnight deadline and [ ] this breach caused damages to Citizens Bank.[22]

Warren Magnuson, who works in the return department for Wells Fargo Services Co. in Minnesota,[23] testified that the checks were prepared for pickup by a courier at or near the midnight deadline for their return. He conceded that he did not know whether they were received by the Federal Reserve Bank before the midnight deadline. All he could say with certainty was that they were received before 6:00 p.m. the following day.

---

**22.** The omitted portions are references to the record or to legal authorities.

**23.** Wells Fargo Services Co. in Minnesota handled the return of checks dishonored by Wells Fargo Ohio.

The first batch of checks was presented to Wells Fargo Ohio on March 27. Wells Fargo Ohio returned this batch to the Federal Reserve Bank on March 29, one day after its midnight deadline. The second and third batches were presented to Wells Fargo Ohio on Friday March 29. Wells Fargo Ohio returned these batches on Tuesday April 2, one day late. The fourth batch was presented on April 1 and returned on April 3, one day late.

Wells Fargo Ohio's return of the checks to the Federal Reserve Bank appears to fit within the extension provided by Regulation CC. The only reasons the trial court recited for declining to permit this extension were that Wells Fargo Texas (1) knew or suspected that the Pate defendants were engaged in a check kite and (2) should be held to a higher duty because of its correspondent banking relationship with Citizens Bank.

We have already rejected the latter of these rationales. The banks' correspondent banking relationship standing alone did not create a fiduciary or confidential relationship which would impose higher than ordinary duties of care on Wells Fargo Texas. *See Aaron Ferer & Sons*, 731 F.2d at 122; *Banco Urquijo*, 861 F.Supp. at 1249; *Peavy–Moore Lumber Co.*, 128 S.W.2d at 1162; *Tillman County Bank*, 257 S.W. at 206–08. Accordingly, Wells Fargo Texas had no obligation toward Citizens Bank with respect to the former's knowledge or suspicion that the Pate defendants were engaged in a check kite. *See Frost Natl. Bank*, 241 F.3d at 874; *Alta Vista State Bank*, 897 F.2d at 934; *Cumis Ins. Society*, 736 F.Supp. at 1233; *First Natl. Bank in Harvey*, 898 F.Supp. at 1231; *Citizens Natl. Bank v. First Natl. Bank*, 347 So.2d 964, 967 (Miss.1977).

We have also concluded that Wells Fargo Texas and Wells Fargo Ohio were separate banks entitled to separate deadlines

for processing checks under the U.C.C. *See* Tex. Bus. & Com.Code Ann. § 4.107; *see Pulaski Bank & Trust Co.*, 759 S.W.2d at 733. Thus, any knowledge or suspicions attributable to Wells Fargo Texas would not impact Wells Fargo Ohio's deadlines for returning the checks. Accordingly, Wells Fargo Ohio timely returned the checks.

Nevertheless, Regulation CC also requires that a paying bank notify the depositary bank if it "determines not to pay a check in the amount of $2,500 or more." 12 C.F.R. § 229.33(a) (2005). The notice requirement is as follows:

> If a paying bank determines not to pay a check in the amount of $2,500 or more, it shall provide notice of nonpayment such that the notice is received by the depositary bank by 4:00 p.m. (local time) on the second business day following the banking day on which the check was presented to the paying bank. If the day the paying bank is required to provide notice is not a banking day for the depositary bank, receipt of notice on the depositary bank's next banking day constitutes timely notice. Notice may be provided by any reasonable means, including the returned check, a writing (including a copy of the check), telephone, Fedwire, telex, or other form of telegraph.

*Id.*

Each of the checks at issue exceeded $2,500. The court found that Wells Fargo Texas and Wells Fargo Ohio "intentionally delayed giving notice of return." However, it is undisputed that Wells Fargo Ohio gave notice of nonpayment within the time required by Regulation CC, though it did not give notice as soon as it could have. Because Wells Fargo Ohio and Citizens Bank were dealing at arms length, Wells Fargo Ohio did not act in bad faith by attempting to shift the loss to Citizens

Bank. *See Frost Natl. Bank,* 241 F.3d at 874; *First Natl. Bank in Harvey,* 898 F.Supp. at 1231; *Citizens Natl. Bank,* 347 So.2d at 969.

Accordingly, the record contains no evidence that Wells Fargo Ohio failed to timely return the checks or failed to give timely notice of nonpayment.

For the foregoing reasons, we sustain Wells Fargo Texas's third issue and overrule Citizens Bank's sole cross-issue. We sustain Wells Fargo Texas's second and fourth issues in part and overrule them in part because of Wells Fargo Texas's failure to timely forward the fourth batch of checks.

### Damages

■ Wells Fargo Texas contends in its fifth issue that there is no evidence or factually insufficient evidence to support the court's finding that Citizens Bank suffered damages from Wells Fargo Texas's breach of its duty of ordinary care.[24]

Section 4.103(e) provides:

The measure of damages for failure to exercise ordinary care in handling an item is the amount of the item reduced by an amount that could not have been realized by the exercise of ordinary care. If there is also bad faith, it includes any other damages the party suffered as a proximate consequence.

TEX. BUS. & COM.CODE ANN. § 4.103(e) (Vernon 2002).

Here, we focus on only the batch of checks which Wells Fargo Texas failed to timely deliver to the Federal Reserve Bank. Wells Fargo Texas should have delivered this batch to the Federal Reserve Bank on Friday, March 29, but it delivered them a day late. Despite Wells Fargo Texas's delay in delivering this batch of checks, it was still presented to Wells Fargo Ohio on the next banking day, Monday, April 1. As we have held, Wells Fargo Ohio timely returned this batch of checks and gave timely notice of nonpayment.

Because the checks were presented to Wells Fargo Ohio on the next banking day, the failure of Wells Fargo Texas to deliver them to the Federal Reserve Bank until the Saturday following its midnight deadline had no effect on the timing of Wells Fargo Ohio's decision to return them. Stated another way, Citizens Bank could not have recovered the sums represented by these checks even if Wells Fargo Texas had exercised ordinary care and delivered them to the Federal Reserve Bank on Friday, March 29. *See id.; SCADIF,* 208 F.Supp.2d at 1376–77; *Pulaski Bank & Trust Co.,* 759 S.W.2d at 726. Thus, there is no evidence to support the court's damages finding. Accordingly, we sustain Wells Fargo Texas's fifth issue.

### Set–Off

Wells Fargo Texas contends in its sixth issue that the court erred in finding that: (1) $892,333 garnished by Citizens Bank from the Pate defendants' account with Wells Fargo Texas under an agreed order was only a conditional set-off against the judgment for failure to timely return the checks; and (2) these garnished funds were not a set-off against the alternative judgment.

Because we will reverse and render a take-nothing judgment in favor of Wells Fargo Texas, we need not address this issue.

### Conclusion

Wells Fargo Texas and Wells Fargo Ohio were separate banks entitled to sepa-

---

**24.** We construe Wells Fargo Texas's fifth issue as a challenge to Finding of Fact No. 50.

rate deadlines for processing checks. The correspondent banking relationship between Wells Fargo Texas and Citizens Bank did not create a fiduciary relationship or otherwise impose a heightened duty of care on Wells Fargo Texas. Although Wells Fargo Texas did not timely forward one batch of checks to the Federal Reserve Bank, Citizens Bank suffered no damages as a result of this delay. Wells Fargo Texas and Wells Fargo Ohio otherwise timely processed the Pate defendants' checks. Accordingly, we reverse the judgment and render judgment that Citizens Bank take nothing.

(Chief Justice GRAY concurring in the result with a note: "Appellant's motion for rehearing is denied. The opinion and judgment dated September 7, 2005 are withdrawn, and the opinion and judgment of even date herewith are substituted therefor.")